THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. CLARENCE BILLINGSLEY, DEFENDANT-APPELLANT.

Argued November 8, 1965—Decided January 24, 1966.

220

*Mr. Henry H. Rubenson* argued the cause for appellant.

*Mr. Thomas P. Ford, Jr.,* Assistant Prosecutor of Essex County, argued the cause for respondent (*Mr. Brendan T. Byrne,* Prosecutor of Essex County, attorney).

The opinion of the court was delivered by

FRANCIS, J. An Essex County Grand Jury returned two murder indictments against defendant Clarence Billingsley. One charged him with killing Rosetta Lucas on March 5, 1964; the other with killing Donna Adams on the same day. Since the murders occurred in the same place as part of a single incident the indictments were consolidated for trial. After a trial which began on November 9, 1964 and terminated on November 25, 1964, the jury found Billingsley guilty of murder in the second degree for the killing of Rosetta Lucas, and guilty of murder in the first degree for the killing of Donna Adams. The trial court sentenced him to 25–30 years in New Jersey State Prison on the second degree murder conviction. The jury having made no recommendation of life imprisonment in the Adams case, the mandatory death sentence was imposed. *N. J. S.* 2A:113–4. Thereafter, Billingsley sought a review in this Court of the validity of the convictions. *R. R.* 1:2–1(c).

The appeal primarily concerns alleged error (a) in admitting defendant's confession in evidence, (b) in certain aspects of the trial court's charge to the jury, (c) in submitting to the jury the issue as to whether the killing of Donna Adams constituted first degree murder, and (d) whether it was a proper exercise of discretion to impose a death sentence and a prison sentence of 25–30 years without requiring the imprisonment to be served before execution of the death sentence.

## I.

Rosetta Lucas and her younger sister, Donna Adams, a ninth grade student in junior high school lived together in a

three room, third floor apartment at 778 North Sixth Street, Newark, N. J. In the late afternoon of March 5, 1964, Norman Lucas, Rosetta's brother-in-law came to the apartment. The entrance door led into the kitchen. The door had one broken pane of glass near the knob and a number of pieces of broken glass were inside on the kitchen floor. On entering, Lucas saw an overturned chair and a bottle of soda on the floor. After looking into the bedroom he telephoned the police. Full examination of the bedroom revealed the brutally murdered bodies of both young women. One was on the bed, the other on the floor. Both had their dresses pulled up and were naked from the waist down.

Autopsy disclosed that Rosetta had fractures of both sides of her lower jaw. In addition she had 24 stab wounds of the front and sides of her chest and in her back. Five of the wounds were classified as fatal, 19 of them had not affected vital parts of the body. Thirty stab wounds of the chest and back were found on Donna Adams, six of them were in vital areas. The County Medical Examiner who saw the bodies at the scene estimated the time of death at between 3:50 and 4:50 P. M.

There were no eyewitnesses to the killings. On the basis of information received from Norman Lucas, the police picked up Billingsley for questioning about 9:30 P. M. the next day and by about 12:30 A. M. on March 7 he had confessed orally to the stabbing of both young women. The officers in charge of the investigation then communicated with an Assistant Prosecutor and an official court reporter. They appeared at about two o'clock in the morning of March 7, and Billingsley's confession was taken stenographically in question and answer form. The circumstances of the interrogation and giving of the statement will be discussed hereafter. In the afternoon of March 7 he was arraigned before a Newark Municipal Magistrate on complaints charging him with the two murders.

At the trial, Norman Lucas, who had furnished the information leading to the police questioning of Billingsley, said he had known defendant since 1959. Sometime around 9:00

A. M. on March 5, 1964 the two men met by chance on the street in Newark. Lucas was on his way to the apartment of his sister-in-law Rosetta Lucas to change his clothes preparatory to a trip to Plainfield, N. J. He kept some of his clothes at Rosetta's place, but did not reside with her. He said he was living on Clinton Avenue, Newark, apparently at a Bordentown Reformatory "half-way" house.

Billingsley, who was 24 years of age, married and unemployed at the time, went along with Lucas to Rosetta's apartment. There he met and had some conversation with Rosetta while Lucas changed his clothes. Quite obviously he was attracted to her because when he and Lucas left he asked Lucas to arrange a date with her during the weekend.

The two men returned to the downtown section of Newark where they parted. Billingsley bought beer and wine and went to his brother's house, also in Newark. At his brother's place he drank whiskey and smoked part of a "reefer" which he said Lucas had given him. Then Billingsley, his brother and two other persons drank the wine and beer he had purchased, as well as some wine his brother produced. He left around 1:00 P. M. to go to his home at 183 Ridgewood Avenue, Newark. He said he was feeling "pretty high" by that time. On the way home he bought a half-pint of mint gin and drank it while walking along.

According to his testimony at the trial he arrived home at about 1:15 P. M. and fell asleep, fully clothed, on his bed. He said he slept until 6:35 P. M. When he awoke his wife was home. After a while he and his wife visited his brother, returned home, had some food and went to bed where he remained until 7:00 A. M. the following morning. He denied returning to the Lucas apartment at any time during the afternoon of March 5, and stabbing the two young women.

As has been indicated above the police began an immediate investigation of the homicides. The information furnished by Norman Lucas resulted in the apprehension of Billingsley for questioning at about 9:30 P. M. on March 6, 1964. The officers who placed Billingsley in the patrol car said that as soon

as he was asked if his name was Billingsley he hung his head and started to sob and rock back and forth. He was told he was a murder suspect and taken in the patrol car to the local Precinct.

After a short time Billingsley was removed to Police Headquarters where around 11:30 P. M. he was questioned in the homicide squad interrogation room by Lieutenant Joseph A. Kinney of that squad. Kinney testified that he told Billingsley they were engaged in a homicide investigation and wanted to ask him some questions as he was a suspect. He advised defendant of his right to answer or not as he saw fit, and that anything he said could be used against him. Kinney said further that Billingsley did not request an attorney, nor was he informed of his right to have one; also that no one threatened Billingsley, or abused or struck him, or made any promises of benefits of any kind or coerced him in order to obtain a statement from him.

At first, according to Kinney, Billingsley denied going back to the Rosetta Lucas apartment on March 5. Then after some indication that the police were aware he had been there in the morning with Norman Lucas and had shown an interest in making a date with Rosetta, he admitted he had gone back to her apartment in the afternoon. He said that after leaving his brother's house following the drinking there, he walked around for a while and then decided to return to the Lucas apartment. On arrival he knocked on the door and Rosetta let him in. They went to the living room where the radio was playing. He took his jacket off and put it on a chair. They started to dance and while doing so he punched her two or three times. He professed not to know why he struck her. (Two witnesses for the State said Billingsley told them that when he feels "high" after drinking, he gets the urge to hit people.) Rosetta fell on the couch and he started to stab her. While doing so Donna Adams, whom he did not know, came into the kitchen. He left Rosetta, went to the kitchen, struck and knocked her down. Then he started to stab her. He heard a movement in the living room and returned to find

Rosetta walking toward the bedroom. He stabbed her some more and she fell on the bed and from there to the floor. Donna came in and he stabbed her an additional number of times. She fell on the bed. He took Donna's coat, dress and pants off, and took Rosetta's pants off, but he denied molesting either of them sexually. Then he put his jacket back on, went to the kitchen, washed off the knife, put it in his pocket and left the apartment. As he left he broke a pane of glass in the door to give the impression that someone broke into the victims' quarters. After leaving he threw the knife in an empty lot around the corner from the premises.

Upon completion of the questioning defendant was taken to the lot where the knife had been discarded. The search for it proved unsuccessful. Billingsley was then returned to police headquarters where arrangements had been made for the appearance of an Assistant Prosecutor and an official court reporter to take his confession in question and answer form. This is in accordance with the practice recommended in *State v. Smith*, 32 *N. J.* 501, 554 (1960) ; *certiorari* denied 3'64 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed.* 2*d* 367 (1961).

The Assistant Prosecutor testified that before beginning the questioning he advised defendant he had no obligation to answer questions and that if he did, anything he said could be used against him. Corroboration of these statements was furnished by Robert E. Rostoff, the court reporter whose testimony as to the entire confession taking, including the attitude of the defendant, was particularly impressive. After receiving the advice as to his right to be silent, Billingsley at first reverted to his original denial that he had returned to the Lucas apartment on the afternoon of the murders. Then during some discussion as to whether his wife or brother could support his assertion that he was home at the time of the murders, the Assistant Prosecutor said: "Well, when did you start dancing with this girl?" Billingsley replied: "When I went back the second————" or, as the court reporter remembered it, "In the afternoon when I went back." At this he stopped, started to tremble and began to cry. After compos-

ing himself he said he had killed the girls and would tell the truth about what happened. The reporter administered an oath to him and he gave substantially the same confession in question and answer form as had been related to Lieutenant Kinney. The statement was completed at 2:55 A. M. The transcript thereof properly was read to the jury. *State v. Bindhammer,* 44 *N. J.* 372, 385 (1965).

After the statement was furnished Billingsley was placed in a cell until about 11:00 A. M. the next morning, March 7, 1964. Shortly thereafter he was taken to the Lucas apartment where he reenacted the killings, and again to the lot where he had thrown the knife. A number of photographs were taken of the proceedings.

Various items of blood stained clothing of the two victims were delivered by the police to John P. Brady, a chemist and toxicologist. His examinations revealed the blood thereon was Type O.

At the time Billingsley was brought in for questioning he was wearing a black jacket, black shirt and a white T-undershirt. They too were delivered to Brady. On examination the jacket showed a large spot of blood on the lower left front area, above the right corner of the left pocket; also another stained area on the left front side "from the end of the zipper area to the end of the pocket on the left side." The black shirt contained a blood stain above the left breast pocket, in the left back and lower right front area. The T-shirt likewise revealed blood. All of these markings were Type O blood. Defendant said he had on a freshly cleaned white raincoat on the day of the murders. The police obtained it the following day from a closet in his bedroom and submitted it to Brady for examination. It showed a blood spot on the lower right front. The blood was type O also. Except for the raincoat Billingsley denied the clothes examined were worn by him on March 5. He contended further that if there was blood on them it came from the beating he received from the police to make him confess to the killings, and he testified that his blood was O type, a fact he said he knew because he had had

blood tests one time when he was sick. The State offered no proof that his blood type was other than O.

A towel and wash cloth taken from defendant's apartment at the same time as the raincoat were found by Brady to have human blood on them. The type was not ascertainable. Defendant said the blood on them came from his dog who had been run over by an automobile on February 28, 1964.

In his testimony defendant not only denied the killings but said the confession was the product of coercion and physical abuse inflicted on him by the homicide squad detectives. He asserted that upon being brought into the interrogation room he was not advised of his right not to answer questions or to refuse to give a statement. He did not understand that he had such right. No one told him he was entitled to an attorney if he wished to have one. At no time did he ask for one. Parenthetically, it may be noted that about four years earlier in Essex County he had been convicted of crime—larceny of an automobile—and was given a suspended sentence to Bordentown Reformatory and placed on probation for three years. It is inconceivable that on that occasion he did not have an attorney of his own selection, or if he was then indigent, one was not furnished to him by the court, whether he was tried or his plea taken. See *R. R.* 1:12–9; 3:5–2(b) ; Form 13A.

Billingsley testified he was seated in a chair in the interrogation room with Lieutenant Kinney and some other detectives. In response to their questions he said he went to his own apartment around 1:30 P. M. on March 5 and fell asleep on the bed and remained there until after 6:00 P. M. Kinney accused him of lying.

His brief here says that in the course of this questioning he asked and was refused permission to see his wife. The record, however, reveals convincingly, not that he wished to see her, but rather that he wanted the police to see her because she would corroborate his story of being at home during the crucial period. One or more of the officers told him they had interviewed his wife and she told them she had not seen him for a week. While on the witness stand Mrs. Billingsley con-

firmed the officers' statement about their visit to her and that she had told them she had not seen him for a week. She testified also that she had lied to the officers.

Billingsley said that after accusing him of lying, Kinney struck him on the back of the head with a book. The other officers punched him and he fell to the floor. With the exception of Kinney, the officers then put on ordinary street gloves. When Billingsley again responded that he had returned to his own home from his brother's place, the officers began punching him about the face and head. He fell to the floor and was pulled up by the hair. On resuming his seat in the chair, he said he was asked for the *first* time if he had not gone back to the apartment in the afternoon and "killed the girls." The same beating process (he said) was repeated a number of times. He testified further that he was told to take off his jacket and shirt and lay across the desk. When he sat on the desk he was pushed backward and one of the detectives hit him in the stomach with a book. As he jerked back up to a sitting position he was struck in the back with a baseball bat. He rolled off on to the floor and the detectives started to kick him hard. At this point, according to his testimony, he yelled, "All right. I did whatever you say I did." He asserted also that as the result of this beating his face, nose and hip were swollen, one eye was bloodshot, his lip was cracked, and blood was dripping down on his T-shirt— the one which had been introduced in evidence by the State. He said nothing, however, to explain the blood found by the chemist on his dress shirt and outside jacket.

After cessation of the alleged physical abuse he was sent to the lavatory to clean up and comb his hair. He did so and shortly thereafter was driven to the vacant lot where he had told the officers the knife was thrown.

In explaining the next happening, *i. e.,* the question and answer statement to the Assistant Prosecutor and the court reporter, Billingsley said he first told them he did not commit the murders and that he had been beaten into admitting

his guilt. At this, Lieutenant Kinney, who was in the room, uttered an ominous profane directive, following which Billingsley decided to furnish the account of the killings already given to the detectives. Defendant's testimony in this regard is contradicted by both Assistant Prosecutor Bianchi and Mr. Rostoff, who said Lieutenant Kinney introduced them to Billingsley, told him to tell them the truth, and left the room. The stenographic record of the confession, as described above, was then made.

Billingsley's explanation of the source of the facts he gave is useful in appraising the truthfulness of the confession. He testified most of them came from a newspaper account of the tragedy which he saw in the interrogation room where he was questioned by the detectives. Obviously the heart of his confession, that is, the specific and detailed information he gave as to the circumstances under which the two killings took place could not have been supplied in that fashion. For example, he said that as he was getting up after stabbing Donna he heard Rosetta in the living room crying, "Why are you doing this to me?" Furthermore, he described the fatal weapon as like a fishing knife, and as having a white handle. We have already noted that the knife was never found, so no one could describe it but the user.

Moreover, when Bianchi and Rostoff appeared to take the statement, they observed no signs of injury about Billingsley's face, nor did he complain of any beating to them. Rostoff's testimony has a distinct aura of credibility about it. He said Billingsley was nervous but polite and cooperative. He introduced himself to defendant, told him he was not connected with the police and was there simply to take a statement. He told Billingsley to relax, there was nothing to be afraid of. Billingsley himself testified Rostoff put his arm on his shoulder and told him not to be afraid, no one was going to hurt him. At one stage before the actual reporting of the confession began, the Assistant Prosecutor left the room for a few minutes. Rostoff had noticed that one sleeve of defendant's

jacket was torn and he inquired about it. Billingsley said it had been torn while he was "messing" around with his brother-in-law. (It was not suggested at the trial that the tear had occurred in any other way.) Then Rostoff asked if anyone had beaten him or shoved him around or mistreated him in any way. The answer was in the negative.

It is appropriate here to recall that about nine hours after the confession was recorded on the stenotype machine, Billingsley went through a reenactment of the crime during which he said he posed as directed by the officers. A number of photographs were taken at this time. Some are quite close up and distinctly show his face. Our examination of them reveals no signs of injuries about the nose, mouth, face or head. Presumably the trial judge and jury reached the same conclusion. Moreover Billingsley testified that shortly after this visit to the victims' home, the police took him to Dr. Marcus Greifinger, Chief Surgeon of the Newark Police Department, for examination. He fixed the time as prior to the arraignment which occurred later in the afternoon. The doctor said no complaints were made of any mistreatment by the police, nor did he complain of any injuries. Defendant's clothes were entirely removed for the purposes of the examination and the doctor found no sign of any injuries. There was no swelling of the nose, and there was no complaint of any injury to it. Dr. Greifinger testified also that he asked Billingsley what happened and was told he had "stabbed two girls in a home on North 6th Street." Defense counsel said he made no claim this admission was involuntary. See *State v. Reynolds,* 41 *N. J.* 163, 180 (1963), *certiorari* denied 377 *U. S.* 1000, 84 *S. Ct.* 1930, 12 *L. Ed. 2d* 1050 (1964). The doctor had made notes of the examination, which on request were turned over to defense counsel for examination. They were returned to the doctor without comment.

According to Billingsley, after completion of the medical examination he was arraigned in the municipal court on the homicide charges. He offered no testimony of any complaints made in that court about mistreatment by the police.

The proof of the State and defendant as to the voluntariness of the confession and the various admissions was taken out of the presence of the jury. At its conclusion, and before the jury returned, the trial judge made a finding that all of the inculpatory statements and the reenactment of the crime were voluntary and not the product of coercion or duress, physical or mental. Therefore, he admitted them in evidence, without informing the jury of his finding. Later in his charge at the close of the case he instructed the jury that its duty was to consider all the relevant evidence on the subject and make a determination as to whether the State had discharged its affirmative burden of proving the voluntariness of the confession and the other inculpatory statements and demonstrations. And he told the jury further, that if the confession and admissions were found to have been voluntarily given, they should be considered and evaluated with all the other proof in the case in determining the issue of guilt or innocence. On the other hand, if the jury found that the State had failed to prove affirmatively their voluntary character the statements and reenactment should be disregarded and given no evidential weight whatever. The procedure followed by the trial court accords with the pronouncements of this Court. *State v. Wolf,* 44 *N. J.* 176, 193–194 (1965); *State v. LaPierre,* 39 *N. J.* 156, 162, *certiorari* denied *Bisignano v. New Jersey,* 374 *U. S.* 852, 83 *S. Ct.* 1920, 10 *L. Ed. 2d* 1073 (1963); *State v. Jackson,* 43 *N. J.* 148, 166–167 (1964).

Billingsley's actual defense to the indictments was that he was home asleep when the murders were committed. The trial court treated his position as an alibi and instructed the jury as to the nature of an alibi's legal effect fully and with liberality toward defendant. His testimony and that of his supporting witnesses presented a clear issue of credibility for jury determination. We can find no legal or factual fault with their determination that the alibi was not entitled to belief. Moreover, no claim is made on appeal that this aspect of the verdict is contrary to the weight of the evidence.

## II.

Defendant contends it was error to admit in evidence his oral admissions and confession made to Lieutenant Kinney and the detectives, and later to the Assistant Prosecutor and the court reporter. (The stenographic record was not introduced; the questions and answers were read by the reporter.) The attack is expressed in variant forms in the brief, but in substance defendant says (1) the admissions and confession were the product of physical and mental coercion, (2) he should have been advised by the police of his right to counsel before the interrogation began, and particularly by the Assistant Prosecutor before he obtained the formal stenographic record of the confession, and (3) it was fundamentally unfair for the Assistant Prosecutor to take the formal confession without first providing an attorney for defendant.

Our independent study of the voluminous record of trial has persuaded us the trial judge was correct in finding that defendant's inculpatory statement, conduct and confession were voluntary and not the result of a will overborne by physical assaults or psychological coercion.

From the time Billingsley was picked up for questioning until the formal question and answer confession was made, his attitude of sobbing, swaying back and forth and crying, as asserted by the police and the court reporter, is consistent with a consciousness of wrongdoing. In about two hours, only a relatively small part of which time had been spent in questioning, he admitted the murders. And about three hours later, with considerable time out for a search for the fatal knife and other matters, he restated his earlier admissions to the Assistant Prosecutor. Thus in about six hours, with relatively little of the period spent in interrogation, his confession of guilt was complete. The arraignment took place in the afternoon of the same day, which under all the circumstances cannot be said to constitute unreasonable delay.

It is entirely understandable that the trial court and the jury disbelieved defendant's story of police brutality. That

all the blood found on his articles of clothing by the State's chemist came from a bruised nose or a cut lip is improbable. The spot of blood on the raincoat he was wearing on the day of the murders cannot be explained by alleged police beatings. Moreover, it is unlikely that the police would have taken the large number of photographs of Billingsley's face during the reenactment of the crime if a beating of the severity described by him had been administered about 12 hours earlier. As we have said, examination of the pictures does not reveal evidence of blows about the head or nose or of a cut lip. Neither the Assistant Prosecutor nor the reporter, Rostoff, saw any bruises or swelling about his face or head. And, it cannot be overlooked that Rostoff, whose testimony breathes sincerity, said he asked Billingsley if he had been physically abused and was given a negative answer. Dr. Greifinger found no signs of injury on full physical examination, and defendant admitted he made no claims of police beating during the examination. And finally he made no charges of police brutality to the municipal magistrate at the arraignment. On the whole case we are satisfied the various admissions and confessions represented an exercise of his free will, and that no reason exists for interfering with such a determination by the trial court and the jury. See *State v. Bindhammer, supra,* 44 *N. J.,* at *pp.* 383-384; *State v. La Pierre, supra,* 39 *N. J.,* at *pp.* 167–171.

This brings us to the claim that the inculpatory statements should have been excluded because Billingsley was not advised of his right to an attorney either before or during the questioning periods, and because he was not given an attorney to advise him before the Assistant Prosecutor obtained the stenographically recorded confession. Reliance for that position is placed principally upon *Escobedo v. State of Illinois,* 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed. 2d* 977 (1964), but the case is not in point. Escobedo had been arrested and released from custody through the action of an attorney retained by him. Later he was picked up again and the police denied his repeated requests to see his attorney. It

appeared also that the attorney had asked and had been refused permission to see his client. The police took an incriminating statement from him without informing him he did not have to make a statement, and without giving him an opportunity to consult with his attorney. In these circumstances the United States Supreme Court reversed the State court criminal conviction based in part on the statement, holding that Escobedo was denied his right to counsel within the meaning of the Sixth Amendment to the Federal Constitution.

In the case before us it is undisputed that Billingsley (who was not without experience in criminal proceedings) did not request the services of an attorney, or that he be allowed to consult one. The Sixth Amendment provides that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * * and to have the Assistance of Counsel for his defence." The courts of New Jersey have long held that this amendment does not mean that an accused *must* have counsel to advise him whether or not to confess. *State v. Murphy,* 87 *N. J. L.* 515, 530 (*E. & A.* 1915). In recognition of the more recent doctrine that the Fifth and Sixth Amendments are binding on the several states as well as on the Federal Government, we accept the view that if an accused in custody requests counsel before submitting to police interrogation or before making a confession, the questioning must be suspended until he has had an opportunity to obtain an attorney of his own choice, or if he is indigent, until an attorney is provided for him. If this course is not followed an incriminating statement obtained thereafter necessarily strongly suggests oppression and fundamental unfairness. But we have consistently held, under circumstances such as were present here, that in the absence of a specific request by him for counsel or for an opportunity to consult with counsel, *Escobedo* is inapplicable. See *State v. Coleman,* 46 *N. J.* 16, 34–35 (1965) and cases cited; *State v. Green,* 46 *N. J.* 192 (1965).

Failure to advise a suspect or an accused of his right to counsel is one of the factors to be considered on the issue of voluntariness, its force depending on the totality of the circumstances attending the giving of the statement. *State v. Naglee*, 44 *N. J.* 209, 222–223 (1965). If the confession viewed in the light of all the circumstances is the understanding product of the accused's free will, and not produced by physical or psychological coercion, or promises of reward or benefit or by other means constituting fundamental unfairness there is no violation of the Fifth Amendment immunity against self-incrimination, nor is the Sixth Amendment involved or transgressed. Since the trial judge and jury in this case were thoroughly justified in finding Billingsley's admissions and confession voluntary, we find no merit in the argument that they should not have been allowed in evidence because he was not advised of his right to an attorney or because he was not provided with one or given an opportunity to obtain one himself.

All the other contentions respecting the admissibility of defendant's incriminating statements and the tests to be applied in determining that issue are subsumed within the above discussion, and so require no further treatment. None of them has legal merit.

### III.

Defendant argues the evidence does not support a finding that the killing of Donna Adams constituted first degree murder.

The suggestion is that the two homicides were the product of a single integrated incident completed within a very short period of time and characterized by no greater homicidal intent toward the one young woman than the other. There is no substance in the argument. In fact the two different verdicts reveal the exercise of considerable mature judgment on the part of the jury.

A murder to be of first degree nature must be premeditated, deliberate and willful. The three mental operations

must be found by the jury beyond a reasonable doubt before such a conviction can be returned, and an instruction to that effect was given in the judge's charge. See *State v. DiPaolo,* 34 *N. J.* 279, 294-295, *certiorari* denied 368 *U. S.* 880, 82 *S. Ct.* 130, 7 *L. Ed.* 2d 80 (1961). In its analysis of the evidence the jury could have concluded reasonably that the killing of Rosetta Lucas was in response to a sudden urge and lacked the element or premeditation or deliberation. That conclusion could logically have led to the second degree murder finding. But as to Donna Adams the proof was much more devastating on the matter of murderous intent. Billingsley was interrupted in his attack on Rosetta by the unexpected appearance of Donna in the kitchen of the apartment. When he turned his attention to her and stabbed her repeatedly it was eminently reasonable for the jury to feel he intended to get rid of a witness by killing her. Under the circumstances a finding that the killing was the product of premeditation, deliberation and willful execution of an intent to kill within *State v. DiPaolo* was clearly justified.

## IV.

Error is asserted because the trial court refused to instruct the jury as requested that a conviction cannot be based upon circumstantial evidence unless such evidence excludes every reasonable hypothesis of innocence.

We have examined the charge on circumstantial evidence and its probative value in the trial of criminal cases. The instructions given clearly and adequately conformed to the most recent pronouncements of this Court on the subject. See *State v. Ray,* 43 *N. J.* 19, 30–31 (1964); *State v. Fiorello,* 36 *N. J.* 80, 88–89 (1961), *certiorari* denied 368 *U. S.* 967, 82 *S. Ct.* 439, 7 *L. Ed.* 2d 396 (1962).

## V.

Defendant further challenges the propriety of the sentences imposed upon him.

The verdict of guilt of murder in the first degree for the death of Donna Adams made it mandatory on the trial judge to impose the death penalty. Such sentence was imposed with a direction that it be executed on "some day within the week beginning Sunday, the 31st day of January, 1965." The second degree murder verdict for the death of Rosetta Lucas called for an imprisonment sentence of not more than 30 years. *N. J. S.* 2A:113–4. A sentence of 25–30 years was ordered.

Defendant contends it was an abuse of discretion not to require the 25–30 year sentence to be served first, and the death sentence to be executed thereafter. Both sentences were proper, the one was required and the other within the statutory limits. The nature of the case is such that the death sentence must be given priority.

## VI.

We have examined all the other specifications of error argued by defendant and find them to be without merit. We agree that the test made by the State of defendant's blood during the course of the trial without notice to his attorney or authorization of the court was highly improper. Fortunately the matter was brought to the attention of the Court out of the presence of the jury, and on defendant's objection and request neither the fact of the making of the test nor the result was brought to the attention of the jury. The proper course would have been an application to the Court for leave to make a blood test. See *N. J. S.* 2A:84A–19; *State v. King,* 44 *N. J.* 346, 356–357 (1965).

## VII.

For the reasons stated the judgments of conviction and the sentences imposed thereon are affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For reversal*—None.