125 N.J. Super. 184 (1973)
309 A.2d 900
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JAMES ELLIS FOYE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 3, 1973.
Decided March 2, 1973.
*186 Before Judges LABRECQUE, KOLOVSKY and MATTHEWS.
Miss Rita L. Bender argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney; Miss Bender, of counsel and on the brief).
Mr. Stephen S. Lippman argued the cause for respondent (Mr. Geoffrey Gaulkin, Prosecutor of Hudson County, attorney; Mr. Lippman on the brief).
PER CURIAM.
Defendant James Ellis Foye was indicted jointly with John Edward Turner for the February 8, 1970 felony murder of Wanda Edwards. N.J.S.A. 2A:113-1. At a separate trial he was convicted of murder in the first degree and sentenced to life imprisonment. N.J.S.A. 2A:113-4.
Wanda, who was 14 years old, was last seen alive at approximately 8:30 P.M. on February 8, 1970. Her body was found in the back of an abandoned truck in a vacant lot in Jersey City on February 21, 1970. An autopsy revealed four stab wounds in the anterior chest wall which were the immediate cause of death. She also had sustained a moderate amount of subarachnoid brain hemorrhage. Her slacks had been torn in the seat and crotch, and her body yielded physical evidence that someone had had sexual intercourse with her shortly before her death.
*187 The victim had attended a sorority meeting at about 6 P.M. on February 8 and had been expected to return home by 8 P.M. At about 8:30 P.M., when last seen alive, she was walking towards her home. When she failed to arrive, and a search of the neighborhood was unsuccessful, the police were notified.
Wanda knew the defendant. He had taken her and her sister to a Newark drive-in on one occasion, and on another occasion had taken them shopping. He had also given her a radio. On the evening of February 8, he, accompanied by Turner, had given her sister a ride to the bus stop. En route she had mentioned to them that she was looking for Wanda.
In a statement given to the police defendant related that on the night of Wanda's disappearance her sister had told him and Turner that Wanda would be coming home from a sorority meeting, and they had waited for Wanda to come home in order to ask her "to have sex with them." He stated: "We just took a chance to see if she would be alone. We had discussed between us whether we should ask her if she would or not. We had thought about it for a few days." They waited until Wanda came down the street, he called her over, and she accepted his invitation to take a ride in his car. The three of them rode around for some time until they arrived at 95 Colden Street where they stopped and he and Wanda got out and urinated. Turner then came over and "fondled" Wanda, and when she started to scream Turner cut off her scream by placing his arm around her neck and stabbing her four times. Turner told him he did so because he saw a "cop coming on a motorcycle." He used a hunting knife that belonged to defendant and was kept in his car over the sun visor. They then threw her body into the truck, Turner wiped the knife off with a rag, and they drove away.
Defendant was picked up on February 24, 1970 and detained for possession of a dangerous weapon (a knife) which was found in his car. Later he was questioned about the *188 murder and at 9:15 P.M. he signed a paper indicating that he had been advised of his Miranda rights, that he understood them, that he wished to consult with his attorney, and did not wish to make a statement. At 4:45 A.M. on February 25 he signed another statement giving his version of the killing in which he indicated that he was familiar with his Miranda rights and waived his right to an attorney. This inculpatory statement constituted the keystone of the State's case.
By his first and second points defendant challenges the admission of his statement into evidence upon the ground that it was obtained from him in violation of his right to counsel, that he did not waive such right, and that, in any event, it was involuntary.
The trial judge held a voir dire hearing out of the presence of the jury before ruling on the admissibility of the statement. The State adduced testimony that defendant had been initially arrested at approximately 4:30 P.M. on February 24 when he approached his car, which the police suspected had been involved in the murder. When they found what they considered a dangerous knife above the sun visor he was taken into custody and booked at the station house on that charge. When later, in response to a police inquiry, defendant stated that he wished to consult with his attorney, he was permitted to make a phone call. Instead of calling an attorney he called his wife, informed her of his arrest, and instructed her to call Goldstaub, his (then and present) attorney. The latter failed to appear and there was no further contact between defendant and his wife or the attorney.
While he was still in police custody, and without advising him that he was also a suspect in the homicide, one of the detectives inquired whether he knew a girl by the name of Wanda Edwards. In response defendant answered that he did know her and followed up by saying, "If you have any idea that I'm involved in the murder, I want to take a lie detector test." He was then advised that he was a suspect in *189 the homicide. When he was thereafter brought to the polygraph section of the detective bureau he declined to take the test, stating that he wanted to "think about it." About half an hour later he again declined to take the test. Eventually, at 7:55 P.M., he agreed to do so with results which were termed "partially conclusive."
Thereafter, at about 9:15 P.M. defendant was formally charged with the murder, and the Miranda warnings listed on the charge sheet were read to him. He again stated that he had his own lawyer and wanted to consult with him. Although he had access to a phone he made no request to make another phone call, nor did he again refer to his attorney. He was later taken downstairs to a room in which the "desk duty" officer was sitting, where he sat on a bench. While there he was given some food and coffee.
At approximately 11 P.M. defendant stated that he had decided to tell about his involvement in the homicide. His attention was then directed to his previous request for an attorney and he was asked if he still wished to have one present before giving a statement. He said that he did not want a lawyer but wanted to get the matter "off his chest." In his verbal statement he involved Turner stating, "I want to help you fellows. If you get Turner you have got your man."
The police thereupon instituted a search for Turner and he was apprehended and brought in at about 3 A.M. He gave a statement admitting his complicity in the homicide, and thereafter confronted defendant in the presence of a number of police officers and related the events leading up to the murder, stating that defendant had been with him. At about 4:45 A.M. defendant gave his written statement to the police.
For the purpose of showing his familiarity with the procedures of custodial interrogation, defendant's prior record of arrests and convictions dating back 20 years, was introduced.
Defendant sharply contradicted the testimony of the police; he denied ever having told the police anything about *190 the murder of Wanda Edwards; he stated that he had been hit by a rubber hose and otherwise pushed, shoved and threatened by the police; that he had been denied permission to call his attorney; that he had only been permitted to call his wife and tell her that he was there and would be home shortly; that he had no sleep; that he signed his name to the "charge sheet" (which contained the Miranda warnings) only out of fear because the police had told him to do so. He averred that he never waived his right to consult with his attorney and never voluntarily consented to the giving of a statement. His attorney, Goldstaub, stated that he had received a message from his secretary informing him that Turner had called, but when he called the First Precinct to speak to Foye he was told that Foye had not been arrested but had only come to the First Precinct to look at some photos. He testified that further efforts by him to locate Foye were unsuccessful. Sergeant Borseso, with whom he testified he first spoke, denied having received a phone call from Goldstaub.
The court, in arriving at its conclusion as to admissibility, made detailed and specific findings of fact as to the events which transpired during defendant's custodial confinement and found, beyond a reasonable doubt, that defendant had been advised of his constitutional rights, had freely and voluntarily waived those rights, and that the statement was voluntary. See State v. Hampton, 61 N.J. 250, 272 (1972).
We hold that the overwhelming weight of the evidence presented at the voir dire supports the findings and conclusions of the trial judge. As we read defendant's brief he appears to contend that once he refused to give a statement and requested to consult with counsel, any statement given thereafter was of necessity coerced. However, merely because he had an attorney and had asked for him did not preclude him from thereafter affirmatively volunteering information, thereby waiving his right to remain silent and to have counsel *191 present. State v. Graham, 59 N.J. 366, 376 (1971). See also State v. McKnight, 52 N.J. 35, 44 (1968). The proofs fully support the conclusion that defendant was advised of his rights but voluntarily chose not to exercise them. See State v. Kremens, 52 N.J. 303 (1968).
While defendant in his brief refers to several examples of "malpractice" by the police during the period he was in custody, we conclude that they were for consideration by the trial judge on the issue of voluntariness and find no cause to disturb his finding on that issue. The suggestion that defendant may have been under the influence of alcohol because he allegedly had consumed two pints of gin and some bourbon prior to his arrest  and another drink while in custody  is belied by the State's proofs and by defendant's appearance at the time of and immediately following his arrest, as well as when his statement was given on the following morning. His testimony that he had been mishandled by the police was inconclusive at most, was supported by no physical evidence, and was disputed by all of the State's witnesses. Their testimony is persuasive that defendant himself had asked to take the polygraph examination (apparently in the belief that it would clear him by involving Turner), and that it was not administered until he had signed the requisite permission. While the initial inquiry of defendant before he was advised of his Miranda rights (which revealed only that he knew the victim and owned a car) should not have taken place, there is nothing to indicate that a continued interrogation was conducted at that time or that the posing of those questions coerced defendant's waiver and written confession on the following morning. Cf. State v. Billingsley, 46 N.J. 219, 234-35 (1966). We find State v. Slobodian, 57 N.J. 18 (1970) to be inapposite. In that case defendant had requested to talk with his attorney before making a statement and had not waived his right to counsel. Likewise in Schenk v. Ellsworth, 293 F. Supp. 26 (D. Mont. 1968), cited by appellant, the defendant had never been specifically informed *192 by the police before he gave his statement that he was a murder suspect. Here there was testimony that at 9 P.M. on February 24th defendant had been so advised. He was 41 years of age, intelligent, and not unfamiliar with legal process (his criminal record included six prior arrests for rape).
By his second point defendant urges that the jury was not properly charged as to the intent essential to a finding of guilt on his part. We do not agree. Defendant was tried for felony murder on the theory that he had been either a principal or an aider and abettor in the forcible rape of the victim. On the question of intent the trial judge charged, in pertinent part:
To find the defendant guilty of murder, you must first find that he committed or attempted to commit the rape. A specific intent to commit the offense of rape is an essential element in the crime of murder as charged in this case. An intent to kill is not an essential element, but there must be an intent to commit the crime of rape.
Immediately before this the jury had been correctly charged:
Rape as a crime is defined as the carnal knowledge of a woman forcibly and against her will. Carnal knowledge means sexual intercourse between a male and female. The essential elements of the crime of rape are carnal knowledge by force by the male and non-consent by the female.
This was a correct exposition of the law. Later, after correctly defining aiding and abetting, the jury was instructed that any person who aided and abetted another in the commission of a crime was punishable as a principal. The judge went on to state:
Therefore, if you find beyond a reasonable doubt that the defendant and John Edward Turner associated themselves in a criminal venture, and each participated in the venture, then it is immaterial, for instance, that only one participant actually murdered Wanda Edwards or that only one participant physically did the killing. *193 This correctly stated the law. N.J.S.A. 2A:85-14; State v. Rosania, 33 N.J. 267, 270 (1960), cert. den. 365 U.S. 864, 81 S.Ct. 828, 5 L.Ed.2d 826 (1961).
Under this point it is suggested that the jury may have been misled into believing that if defendant intended only to have consensual, as distinguished from forcible, intercourse with the victim he could be found guilty of felony murder. We disagree. Consideration of the charge as a whole makes it clear that the rape referred to was the forcible rape of the victim and that defendant could only be found guilty if he forcibly raped or attempted to forcibly rape the victim, or aided and abetted Turner in doing so. We hold that the jury was properly and adequately instructed and the court's refusal to supplement the charge was not error. State v. Thompson, 59 N.J. 396, 411 (1971).
Defendant's final point challenges the court's denial of his motion for acquittal. We find it to be without merit. Applying the test laid down in State v. Reyes, 50 N.J. 454, 458-459 (1967), we are satisfied that there was sufficient evidence upon which the jury could have found defendant guilty beyond a reasonable doubt of the crime charged. The evidence was plenary that the deceased had been the victim of a forcible rape. When her body was found her panties were missing and the slacks she had been wearing had been torn in the crotch and seat. An autopsy revealed the presence of spermatozoa and (nonmenstrual) blood. Her screams which, according to defendant's statement, were silenced by Turner by means of his knife, are strong evidence that the two were attempting to accomplish their objective by force or had already done so. The jury was not bound by defendant's statement that he and the victim got out of the car only to urinate and that Turner had only attempted to "fondle" her when she started to scream. The presence of the knife outside the car (which defendant stated he kept above the sun visor), the fact that defendant and (allegedly) the victim were the first to exit the car, and that when Turner's *194 turn came he had the knife in his hand  as well as the cool, precipitate manner in which defendant and Turner disposed of the body and drove away from the scene  adequately support an inference that the victim had been raped.
The judgment of conviction is accordingly affirmed.