IN RE PAROLE APPLICATION OF THOMAS TRANTINO.

Argued December 15, 1981—Decided May 20, 1982.

348

*Stuart F. Pierson*, a member of the District of Columbia Bar, argued the cause for appellant Thomas Trantino (*George W. Conk*, attorney; *Stuart F. Pierson, Richard L. Cys* and *Nikki Heidepriem*, members of the District of Columbia Bar, of counsel).

*Roger H. McGlynn*, Special Counsel, argued the cause for respondent and cross-appellant New Jersey State Parole Board (*Lum, Biunno & Tompkins*, attorneys).

*Peter R. Feehan* submitted a brief on behalf of *amici curiae* the Voto Family and the Tedesco Family (*Feehan & Feehan*, attorneys).

*Harry G. Carroll* submitted a letter in lieu of brief on behalf of *amicus curiae* Bergen County Police Chiefs' Association (*Donald R. Conway*, attorney).

The opinion of the Court was delivered by

HANDLER, J.

This case raises important questions concerning the interpretation and application of the Parole Act of 1979. The initial issue presented on appeal is whether the State Parole Board is authorized under the Parole Act to impose restitution as a condition of parole for an inmate convicted of homicide and, if so, what standards are to be applied in fixing the amount of such restitution. We must also decide whether the State Parole Board has the authority under appropriate circumstances to reconsider its determination that an inmate is entitled to parole. Further, this case requires us to consider the factors relevant to a parole decision under the Parole Act, especially with respect to inmates who were sentenced prior to the enactment of the current New Jersey Code of Criminal Justice.

These issues are raised in two consolidated appeals that resulted from parole proceedings concerning Thomas Trantino, who killed two police officers in 1963. These murders occurred in the wake of a robbery committed by Trantino and an accomplice. The two were celebrating the success of their criminal exploits in a Lodi nightclub and became so disruptive that police were called to the scene. When the officers arrived, Trantino and his partner managed to gain physical control over the two policemen and then proceeded to humiliate and torture them. The slayings were particularly brutal in that the two officers were forced to strip partially, pistol-whipped into near unconsciousness and then, despite their desperate pleas to be spared, repeatedly shot. In 1964 Trantino was convicted of murder in the first degree. The jury failed to recommend mercy, and Trantino was sentenced to death. He remained on death row until 1972 when the death penalty law under which he was sentenced was invalidated. *State v. Funicello*, 60 *N.J.* 60 (1972). His sentence was then commuted to life imprisonment. Under this sentence Trantino became eligible for parole in 1979.

Trantino's prison record has improved over the years. After an early period of unruly behavior, during which he was cited

for 28 institutional infractions, he has more recently shown signs of progress. He is now housed at a minimum security facility and has served as a counsellor for other offenders. In addition, he has taken up writing, which he apparently plans to pursue as a career if paroled. Moreover, in 1980 Trantino married. He hopes to live in New York with his wife and her mother if he is released on parole.

The public outcry over Trantino's possible release was loud and swift. The families of the murdered officers organized efforts to keep Trantino in prison, and his case became the focus of widespread media attention, including a television special called "The Night of the Devil." Crowds of demonstrators have followed this case vociferously at every stage.

On March 1, 1979, after Trantino first became eligible for parole, the Parole Board, operating under the former parole statute, N.J.S.A. 30:4–123.14 (repealed), denied Trantino's request for parole for punitive and deterrent reasons. The Board scheduled a rehearing to be held one year later. On March 4, 1980, a two-member Board heard his case and recommended parole contingent upon Trantino's acceptance in a New York parole plan. However, when the full Board met to consider the case on April 1, 1980, the Board once again denied parole, explaining that "the punitive aspect of this sentence has not been satisfied." A rehearing was scheduled for June 1980.

Trantino's case was next heard on June 9, 1980. At that time proceedings were conducted under the current statute, the Parole Act of 1979, L.1979, c. 441, N.J.S.A. 30:4–123.45 et seq. A single Board member, sitting as a hearing officer, heard the case and recommended parole. He concluded that "[a]lthough committed on a very serious charge, [Trantino] has met requirements for release consideration. I find no substantial likelihood [of future criminal conduct]."

A certifying member of the Board, Chairman Dietz, confirmed the hearing officer's recommendation on July 3, 1980, and approved parole effective no earlier than August 12, 1980. The

parole was made subject to several special conditions, including intensive supervision and restitution, the amount to be set by the sentencing court.

Chairman Dietz then requested that the Superior Court fix the amount of restitution. On September 23 and 24, 1980, the court conducted hearings and heard testimony about the losses suffered by the families of the victims and about Trantino's ability to pay restitution. It also heard legal arguments from attorneys for Trantino, the families of the victims, the Parole Board, the Public Advocate, and various police organizations on the question of whether restitution is a proper condition for parole in a murder case.

On October 2, 1980, the judge determined that it was impossible to fix an amount of restitution because that process would entail placing a value on a human life. He concluded that Trantino must remain in prison because the Parole Board believed Trantino's rehabilitation required restitution, which could not be imposed. The judge remanded the matter to the Parole Board for further proceedings.

On October 8, 1980, the Board vacated the July 3, 1980 decision, which had established a parole release date of not earlier than August 12, 1980, on condition of restitution. The case was then referred to the adult board panel for further review. Five members of the seven-member Board conducted a hearing on November 13, 1980.[1] The Board rendered a formal written decision on December 1, 1980. By a three-to-two vote, the Board granted a parole release date effective no earlier than December 23, 1980, to a New Jersey parole plan and again included restitution as a special condition. The Board stated that if the precondition of restitution could not be met because the courts find it inappropriate, then another parole hearing on the issue of release would be necessary.

---

[1] Though proceeding with the parole hearing, on November 20, 1980, the Parole Board appealed the trial court's decision refusing to set restitution.

Two appeals resulted from these proceedings: the first on November 20, 1980, by the Parole Board from the trial court's order refusing to fix the amount of restitution; the second on December 17 by Trantino from the Board's decision of December 1. The two appeals were consolidated in the Appellate Division, which affirmed the trial court's order refusing to set an amount of restitution and reversed that part of the Board's December 1 decision imposing restitution as a condition of parole. 177 *N.J.Super.* 499 (1981). The court also affirmed the decision of the Board that Trantino remain in prison and that a new hearing be held to consider his release if restitution could not be ordered. The Appellate Division remanded the case to the Board for further proceedings. Both Trantino and the Board petitioned for certification, and this Court granted both petitions. 87 *N.J.* 385 (1981).

## I

The initial question presented is whether restitution can be imposed under the Parole Act of 1979 as a special condition of parole for an inmate convicted and sentenced for an intentional homicide.

The Parole Act of 1979 effected a radical change in the parole system in New Jersey. The former parole law authorized parole only if the Board determined that "there is a reasonable probability that, if such prisoner is released, he will assume his proper and rightful place in society, without violation of the law, and that his release is not incompatible with the welfare of society." *N.J.S.A.* 30:4–123.14 (repealed). The 1979 Act postulates a much narrower standard for determining an inmate's fitness for parole. It states that "[a]n adult inmate shall be released on parole at the time of parole eligibility, unless [it is demonstrated] ... by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime under the Laws of this State if released." *N.J.S.A.* 30:4–123.53(a). The Act thus posits the likelihood of future criminal conduct as

the determinative test for parole eligibility and effectively establishes a presumption in favor of parole.

Further, the Parole Act specifically authorizes the Parole Board to impose restitution as a condition of parole. The Act reads, in pertinent part, that

> ... based on the prior history of the parolee, the member of the board panel certifying parole release ... may impose any other specific conditions of parole deemed reasonable in order to reduce the likelihood of recurrence of criminal behavior. Such special conditions may include, among other things, a requirement that the parolee make full or partial restitution. [*N.J.S.A.* 30:4–123.59(b)]

This provision also requires that "the amount of [such] restitution shall be set by the sentencing court upon request of the board." *Id.*

In affirming the decision of the lower court in this case, the Appellate Division gave a narrow interpretation to the statutory concept of restitution as a parole condition. It concluded that by restitution, the Legislature meant that the inmate must restore the fruits of the offense to the victim. The court distinguished "restitution" from "reparation," which it viewed as compensation for damages or losses caused by a crime. 177 *N.J.Super.* at 518. The Appellate Division believed that by referring only to "restitution" in the Parole Act, the Legislature intentionally meant to exclude "reparation" as an available condition for parole. It found significant the fact that the Legislature had also failed to refer to reparation as a condition of probation in the contemporaneous enactment of the Code of Criminal Justice, *N.J.S.A.* 2C:1–1 *et seq.*, even though both reparation and restitution had been included as available probationary conditions under the prior law.[2] *N.J.S.A.* 2A:168–2.

---

[2]In the context of probation, however, many courts have made no effort to distinguish between "reparation" and "restitution." See, *e.g., People v. Miller*, 256 *Cal.App.*2d 348, 64 *Cal.Rptr.* 20 (1967) (in determining restitution as a condition of probation in connection with defendant's previous conviction of grand theft, defendant required to make his victims whole; restitution was not limited to the transaction or amounts for which defendant was actually convicted). See generally Annot., "Propriety of Probation Which Requires Defendant Convicted of Crime of Violence to Make Reparation of Injured

The Appellate Division added that this Court has recognized a distinction between restitution and reparation. See, *e.g., State v. Harris,* 70 *N.J.* 586 (1976); *State in the Interest of D. G. W.,* 70 *N.J.* 488 (1976).

The language of the Parole Act mentions restitution as one of many possible parole conditions. The statute specifically authorizes the Board to "impose any other specific conditions of parole deemed reasonable in order to reduce the likelihood of recurrence of criminal behavior." *N.J.S.A.* 30:4–123.59(b) (emphasis added). Thus, if reparation is "deemed reasonable" by the Board as conducive to the rehabilitation of an inmate, it would be permissible as a parole condition. *Cf. State v. Bausch,* 83 *N.J.* 425, 433 (1980) (similar probation provision that permits a court to compel a defendant "to satisfy any other conditions reasonably related to the rehabilitation of the defendant," *N.J. S.A.* 2C:45–1(b)(12), construed as granting court discretion to formulate appropriate conditions for particular cases).

The issue in this case then is not whether the Parole Act of 1979 bars "reparation" in some broad sense, but whether the Legislature intended to authorize that a parolee convicted of homicide can be required to compensate persons for losses, damages or injuries which go beyond the return of the direct economic spoils of the crime. We hold that such compensatory payments in the nature of reparations are authorized by the Parole Act, provided they are imposed in a manner which will "reduce the likelihood of the recurrence of criminal behavior."

It has been observed in the analogous context of probation that the value of restitution or reparation is that a "defendant who learns that he cannot profit from crime or that if he does damage he must pay for it, has taken a large step forward in the process of rehabilitation." *Model Penal Code* § 301.1, comment

Victim," 79 *A.L.R.3d* 976 (1977). See also *State in the Interest of D. G. W.,* 70 *N.J.* 488, 493 n.1 (1976); *State v. Summers,* 60 *Wash.2d* 702, 375 *P.2d* 143 (1962).

7 (Tent.Draft No. 2, 1954). Compensatory payments can have correctional worth, regardless of whether the offender is required only to disgorge the fruits of his offense or to compensate persons for the injuries and losses suffered as a result of his crime. See *State v. Morgan*, 8 *Wash.App.* 189, 190, 504 *P.2d* 1195, 1196 (1973). As we explained in *Harris* :

Unlike a fine as a condition of probation, or service of a jail term prior to supervision, restitution has an understandable logic. It is directly related to the offense and the attitude of the offender... Society wants to make sure the offender realizes the enormity of his conduct; and it asks him to demonstrate this by making amends to the individual most affected by the defendant's depredations. [70 *N.J.* at 593, quoting *Dressler, Practice and Theory of Probation and Parole* at 176–77 (1959)]

In general, the rationale for requiring restitution or reparation would seem to be as applicable to violent crimes as it is to property crimes. In either context, it serves to impress upon the offender "the enormity of his conduct." *Id.* Thus, restitution or reparation as a condition of probation has often been imposed where the defendant was convicted of crimes of physical violence. See, *e.g., State v. Garner*, 115 *Ariz.* 579, 566 *P.2d* 1055 (Ct.App.1977); *Biddy v. State*, 138 *Ga.App.* 4, 225 *S.E.2d* 448 (1976); *People v. Stacy*, 64 *Ill.App.2d* 157, 212 *N.E.2d* 286 (1965); *People v. Williams*, 57 *Mich.App.* 439, 225 *N.W.2d* 798 (1975); *State v. Behrens*, 204 *Neb.* 785, 285 *N.W.2d* 513 (1979); *State v. Green*, 29 *N.C.App.* 574, 225 *S.E.2d* 170, *cert.* den., 290 *N.C.* 665, 228 *S.E.2d* 455 (1976); *State v. Gunderson*, 74 *Wash.2d* 226, 444 *P.2d* 156 (1968), overruled on other grounds, *State v. Gosby*, 85 *Wash.2d* 758, 539 *P.2d* 680 (1975).

However, a number of courts have adopted a narrower interpretation both as to the types of crimes for which such payments can be imposed, as well as to the kinds of losses that can be repaid. See, *e.g., People v. Becker*, 349 *Mich.* 476, 84 *N.W.2d* 833 (1957); *State v. Stalheim*, 275 *Or.* 683, 552 *P.2d* 829, 79 *A.L.R.3d* 969 (1976); *Commonwealth v. Walton*, 483 *Pa.* 588, 595 n.10, 397 *A.2d* 1179, 1183 n.10 (1979); *Commonwealth v. Fuqua*, 267 *Pa.Super.* 504, 507 n.5, 407 *A.2d* 24, 25 n.5 (1979). See also Best & Birzon, "Conditions of Probation: An Analysis," 51 *Geo.L.J.*

809, 826 (1963); Comment, 30 *Rutgers L.Rev.* 604, 608 n.99 (1977).

In *Stalheim,* relied upon by both lower courts here, it was held that restitution or reparation payments are not available in instances of violent crime.[3] The court advanced two reasons for refusing to require, as a condition of probation, payments to a person other than the victim of a violent crime. First, the court believed that the rehabilitative effect of making an offender appreciate the injury which he caused is significantly diluted when payment is made to someone other than the victim. 275 *Or.* at 688, 552 *P.2d* at 832. That reasoning is not persuasive. If a crime causes injury not only to the immediate victim but also to others, as is the case with a homicide, there is no reason why payment to suffering third persons will not make the offender appreciate the loss which he has caused as greatly as payment to the victim would. See, *e.g., State v. Summers,* 60 *Wash.2d* 702, 375 *P.2d* 143 (1962).

The second reason given by the *Stalheim* court is the problem of assessing damages. The court was particularly concerned about the lack of evidence available to a trial judge presiding over a criminal trial and the consequential unfairness to both defendant and victim. 275 *Or.* at 687, 552 *P.2d* at 831. The trial judge in the instant case was also baffled by the difficulty of fixing damages for restitution in a homicide case.

The problem of fixing the amount of restitution or reparation payments is a real one. In *Harris,* we recognized the practical limitations on the use of restitution or reparation as a rehabilitative tool in the related field of probation and stressed that

[t]he restitution or reparation required may not go beyond the actual loss or damage as established in the prosecution and must be directly related to the

---

[3]The court construed the term "restitution" to mean the return of a sum of money, an object, or the value of an object which a defendant wrongfully obtained in the course of committing the crime. "Reparation" was defined somewhat more broadly as a repairing or restoring to good condition. 275 *Or.* at 687, 552 *P.2d* at 832.

crime. Restitution serves the purposes of rehabilitation, if used to support a healthy attitude by the offender. It also serves to restore the loss (although partially) to the victim of the crime. [70 *N.J.* at 598, quoting *Rubin, The Law of Criminal Correction* at 200–01 (1963) ]

While acknowledging that restitution or reparation is available for cases involving violent crimes, other courts have similarly limited the amount of such payments. See Annot., *supra*, 79 *A.L.R.*3d at 993–98. For example, in *People v. Pettit*, 88 *Mich. App.* 203, 276 *N.W.*2d 878 (1979), a defendant convicted of negligent homicide was ordered as a condition of probation to pay restitution to cover the funeral expenses and the expenses incurred in the repair of the automobile that decedent was driving. In *Summers*, a defendant guilty of manslaughter was required to pay the decedent's funeral expenses as "restitution to any person or persons who may have suffered loss or damage by reason of the commission of the crime in question." 60 *Wash.*2d at 707, 375 *P.*2d at 145.

The purpose of restitution or reparation in the setting of parole is not to make the aggrieved persons whole but to assure rehabilitation of the offender and to prevent the recurrence of future criminal conduct. Insuring that restitution or reparation is used as an instrument for rehabilitation requires circumspection in fixing the amounts which can, or should, be exacted from a parolee as a condition of parole. If restitution or reparation is not honed closely to the contours of rehabilitation, there is a danger that it will become nothing more than a weapon for retribution, rather than a useful tool for personal progress and socialization.

Furthermore, in allowing such payments as a condition of parole, we must be mindful of the goal of the Parole Act "to make the parole process more consistent, predictable, objective and efficient." Assembly Judiciary, Law, Public Safety and Defense Committee Statement to Assembly No. 3093 (1979). The legislative plan for bringing consistency, certainty and celerity into the parole process would be undone if the courts were invited into evidential labyrinths in fixing restitution. The

basic task of reaching a fair, comprehensible and acceptable formula for restitution in a homicide case is extraordinarily difficult and should be done without making intractable inquiries into the valuation of life, permanency of physical injury, pain and suffering, loss of long-term future earnings, deprivation of pecuniary expectancy, consequential and derivative losses, and other indirect or remote injuries. Encouragement of such awards in the guise of restitution would surely hobble a parole system geared toward achieving clarity, predictability and efficiency.

■ Accordingly, we hold that in the context of parole the terms, "restitution" and "reparation," may be used interchangeably and that the Parole Board may impose restitution or reparation as a condition of parole for an inmate convicted of homicide. The sentencing court, upon the request of the Parole Board, is to make the determination of the amount of restitution. *N.J.S.A.* 30:4–123.59(b). However, the elements or factors to be considered in calculating the restitutional amount must first be decided by the Parole Board. The determination by the court of the amount of restitution shall be limited to those factors specified by the Parole Board. The discretion to specify the elements to be included in restitution properly reposes in the Parole Board because of its statutory authority to decide the inmate's fitness for parole and to fashion a comprehensive parole plan, including restitution, which will be most conducive to successful rehabilitation.

■ We hold further that in the exercise of its discretion to impose restitution as a condition of parole and to identify the elements of restitution, the Parole Board must meet and satisfy certain criteria. The Parole Board itself must specify to the sentencing court the manner in which each of the following factors are to be applied in fixing the restitutional amount. First, the amount of restitutional payments amount must be realistically limited. It must be readily and objectively measurable so as not to go beyond the obvious and actual loss or

damage caused by the crime. To assure this end, the Parole Board should carefully restrict the elements of restitution. The Board, in appropriate situations, may limit damages to medical expenses and related costs, funeral expenses, specific personal property losses, and other less common losses if clearly provable. It may decide in a given case to include within the restitutional amount lost wages for limited periods of time which do not involve assessments of life expectancy. Such damages, however, should not include the valuation of life, permanent injury, pain and suffering, loss of companionship, services, nurture, support and other derivative and indirect losses, or costs not readily demonstrable on an objective basis.[4] Second, restitutional payments in the homicide context must be made to the persons most directly affected by the parolee's criminal acts. These persons would ordinarily be the decedent's dependent spouse, minor children or parents. Third, restitution must be related to the parolee's ability to pay. This obligation must be carefully integrated into the overall parole plan so that rehabilitation will not be jeopardized. Finally, as an overarching requirement of particular importance, restitution must be directly related to the offense and the attitude of the offender. The losses that necessitate restitution must flow directly and proximately from the criminal act so that the payment for these losses to aggrieved persons acts as a continuing reminder to the offender of his offense and a constant incentive for self-improvement.

The Parole Board's apparent perception of the nature and scope of restitution, as well as its role in imposing and defining restitution, is substantially at variance with our determination

---

[4]We believe that these limitations on the scope of restitution comport with the overall purposes of the Parole Act of 1979. It is appreciated that in permitting restitution or reparation as a parole condition, the Legislature has not addressed that subject with any specificity. We recognize that conditions of parole are uniquely a legislative prerogative. Therefore, the Legislature may, if it sees fit, amend the Parole Act to deal more specifically with the subject of restitution.

today. In each of its parole decisions, the Board expressed the view that restitution, in no way defined or limited in amount, should be established by the court and made payable to the survivors of the victims or their designees or others suffering losses. Clearly, this standard for restitution is much too imprecise and broad. The Board's decision predicating parole on a significant condition which includes such an amorphous concept of restitution cannot be sustained.

## II

The question next presented is whether the Parole Board has the authority to reconsider its determination that Trantino is otherwise eligible to be released on parole and whether the Board should be directed to reconsider its prior determination in light of our present ruling. Trantino argues that the Board may not reconsider its decision to release him, regardless of this Court's decision concerning the validity or permissible scope of restitution. Relying on principles of *res judicata*, Trantino contends that the Board is bound by its prior determination that there is no substantial likelihood he will commit future crimes and that, therefore, he is entitled to be released on parole.[5]

---

[5]Trantino further argues that he has a due process right to parole because the Board has already adjudged him unlikely to commit future crimes if released, which is the sole statutory basis for making a parole determination under the new Act. This constitutional claim is without merit. The Supreme Court has repeatedly held that the due process clause does not give an inmate a constitutionally protected liberty interest simply because the state provides for the possibility of parole. See, *e.g., Jago v. Van Curen*, —— *U.S.* ——, 102 *S.Ct.* 31, 70 *L.Ed.2d* 13 (1981); *Connecticut Bd. of Pardons v. Dunschat*, 452 *U.S.* 458, 101 *S.Ct.* 2460, 69 *L.Ed.2d* 158 (1981); *Greenholtz v. Nebraska Penal Inmates*, 442 *U.S.* 1, 99 *S.Ct.* 2100, 60 *L.Ed.2d* 668 (1979). It must be remembered that "[p]arole is not a constitutional right but an act of leniency or grace and a device for the protection of society through the rehabilitation of the offender." *State v. Davis*, 175 *N.J.Super.* 130, 145 (App.Div.), certif. den. 85 *N.J.* 136 (1980). See *State v. Lavelle*, 54 *N.J.* 315 (1969); *Mastriana v. New Jersey Parole Bd.*, 95 *N.J.Super.* 351 (App.Div.1967); *State ex rel. Kincaid v. State Parole Board*, 53 *N.J.Super.* 526 (App.Div.1959).

■ Trantino mischaracterizes the relevant legal principles in arguing that the Parole Board cannot reconsider its earlier decision to release him on parole. Contrary to Trantino's assertions, the reconsideration or redetermination of an agency decision involving the same parties and the identical subject matter does not implicate the doctrine of *res judicata* as such. In the absence of a legislative restriction, administrative agencies generally have the inherent power to reopen or to modify and rehear prior decisions. See, *e.g., Ruvoldt v. Nolan,* 63 *N.J.* 171, 183 (1973); *Castellucci v. Bd. of Review,* 168 *N.J.Super.* 301, 306 (App.Div.1979); *Trap Rock Industries,* 133 *N.J.Super.* 99 at 109. See generally 2 *Davis, Administrative Law,* § 18.03 at 558.

■ The Parole Board retains the right to reconsider and redetermine a prior decision in appropriate circumstances, subject, of course, to limitations relating to fairness and reasonableness. *Cf. N.J.A.C.* 10A:71–5.6(b) (parole rescission hearing can be held to determine good cause for reconsideration of prior decision). There are several reasons why, in this case, the Parole Board should reconsider and redetermine the question of Trantino's fitness for parole.

The Parole Board's decision that restitution be imposed as a parole condition was a material and constituent factor in reaching its ultimate conclusion that there was a substantial likelihood that Trantino would not commit future crimes if released. As the Board stated unmistakably in its decision of December 1, 1980:

The Special Condition of restitution is not intended to mitigate the serious harm which was committed by this offense but *rather is intended as a compelling reminder of the wrong which was done. As such, restitution is meant to reduce the likelihood that the applicant would resort to criminal behavior and to further assist in the rehabilitative process.* This is a valuable tool established by the Legislature for the Board's use. (emphasis added)

The imposition of restitution as a parole condition in this case was not an independent, severable or free-standing factual determination made by the Board. Rather, it was an integral and indispensible component of the Board's determination that there was no likelihood of future criminal conduct by Trantino.

 Our modification of the Board's imposition of restitution as a condition of parole puts an entirely different cast upon its ultimate determination that there is no substantial likelihood that Trantino will commit future criminal acts if released. A new development or new evidence relating to established facts or a material misapprehension concerning an essential matter which is critical to an agency determination can constitute a reasonable basis for reconsideration by the agency. See *Trap Rock Industries,* 133 *N.J.Super.* at 110. Moreover, matters not previously considered or properly weighed can justify agency reassessment of a determination. See *N.J.A.C.* 10A:71–5.6(b) (circumstances not previously considered can constitute good cause for reconsideration of parole decision). Here, the Parole Board's misapprehension of the nature of restitution and the Board's special responsibility in determining the elements or factors to be considered by the court in fixing the amount of restitution, as elucidated by our decision, constitute a novel and substantial development with respect to a matter which is crucial to its ultimate determination of fitness for parole. As previously noted, the Parole Board itself acknowledged that its imposition of restitution was an essential basis for its determination. We are therefore satisfied that our ruling today substantially invalidates the Parole Board's attempted use of restitution and requires reconsideration of the Board's prior parole decision.

 Trantino claims that it would be inequitable and unfair for the Board now to change its decision. Considerations of individual fairness, repose and party reliance are relevant in terms of whether an agency proceeding should be reopened. *Ruvoldt,* 63 *N.J.* at 183; *Trap Rock Industries,* 133 *N.J.Super.* at 110. Detrimental reliance upon agency adjudication and resulting unfairness would militate against such administrative redetermination. *Cf. Mallamaci v. Dietz,* 146 *N.J.Super.* 15 (App. Div.1976) (Parole Board not allowed to redetermine eligibility for parole where there were no new facts present since last hearing and erroneous pre-release was not result of prisoner's own actions). In this case, however, a reconsideration by the

Parole Board will not occasion any individual unfairness stemming from detrimental reliance, delay or the like. The Board's decision awarding parole has been under prompt, continuing and responsible challenge, and has not achieved finality.

We therefore hold that under these circumstances the Parole Board is required to reconsider and redetermine its prior decision that Trantino be released on parole.

## III

Because the matter must be remanded to the Parole Board for reconsideration and redetermination of Trantino's fitness for parole, it is necessary for us to explain the standards to be applied by the Board. We do so to eliminate the confusion which has attended this case, to provide guidance for the Parole Board and to bring these parole proceedings to an expeditious conclusion.

As already noted, parole must be granted unless it is shown by a "preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime [in the future]." *N.J.S.A.* 30:4–123.53(a). The Parole Board has adopted rules and regulations implementing this statutory standard. *N.J.A.C.* 10A:71–3.11(b). These cover most matters that would be relevant to parole fitness, such as the inmate's conduct while incarcerated, prior record, nature of the offense, previous probation or parole experience, participation in institutional programs, health, parole plans, motivation, family relationships, availability of community resources or support services, history of employment, military service, education and the statements of the sentencing judge. *Id.*

Trantino contends that he was originally denied his parole in 1979 and 1980 under the former parole statute solely because the "punitive aspects" of his sentence had not yet been satisfied. He asserts that he is now eligible for parole because his fitness for parole must be determined under the new Parole Act. Trantino concludes that there is nothing more to be considered

concerning his entitlement to parole under the new Parole Act, since the Act eliminated "punitive considerations" as an independent basis for denying parole and the Board has already determined that he is fully rehabilitated.

There is a fundamental fallacy in Trantino's position. It is true, as he contends, that the Parole Act of 1979 applies to all persons currently incarcerated in the State prison system upon their parole eligibility dates. *N.J.S.A.* 30:4–123.46. The Parole Act provides a single and exclusive standard for parole entitlement—the likelihood of recidivism—and it prescribes that this standard shall apply prospectively from the effective date of the enactment to all persons serving State prison terms.

Nevertheless, while the Parole Act posits a single standard for all parole-eligible inmates, not all such inmates are similarly situated in terms of the way in which the standard applies to them. This case presents one such fundamental difference' among classes of parole-eligible inmates. There is a material difference for parole purposes between inmates serving sentences imposed prior to the enactment of the New Jersey Code of Criminal Justice and those sentenced under the Code. See *N. J. State Parole Board v. Byrne,* 182 *N.J.Super.* 540, 544 (App. Div.1982).

The previous law provided for State prison terms with minimum and maximum time limits. Eligibility for parole, however, was not directly determined by the sentence. A complex of factors and computations required by statute, administrative regulations and institutional rules and practices governed the amount of time an inmate was required to serve in prison before he was entitled to parole consideration. *N.J.S.A.* 30:4–123.16 (repealed). See, *e.g., Cain v. N. J. State Parole Bd.,* 78 *N.J.* 253 (1978); *Bonilla v. Heil,* 126 *N.J.Super.* 538 (App.Div.1974). In addition, pre-Code sentenced inmates became eligible for parole consideration under these complex standards without regard to whether the punitive aspects of their sentences had been satisfied. Further, in terms of an inmate's fitness for parole release,

the parole decision itself was intensely discretionary. It involved not only the likelihood of recidivism but also the inmate's ability to assume a responsible role in society consistent with the public welfare. *N.J.S.A.* 30:4–123.14 (repealed). See *Monks v. N. J. State Parole Bd.*, 58 *N.J.* 238 (1971). Thus, under the former parole system, the sufficiency of punishment was a highly relevant consideration in parole determinations. The Parole Board was required to assess whether the inmate had served enough time in prison and been sufficiently punished in terms of both society's need for adequate punishment and the inmate's individual progress toward rehabilitation. See, *e.g., Beckworth v. N. J. State Parole Bd.*, 62 *N.J.* 348, 353 (1973); *In re Buehrer*, 50 *N.J.* 501, 509 (1967).

The current Code and Parole Act stand in sharp contrast to the previous scheme. A new sentencing structure has been imposed in which the discretionary aspects of the sentence for most offenses are more clearly drawn. See Assembly Judiciary, Law, Public Safety and Defense Committee Statement, Assembly to No. 3093 (1979). Specific mitigating and aggravating factors which the sentencing judge must consider are enumerated in the Code. *N.J.S.A.* 2C:44–1(a) and (b). Moreover, while fitness for parole remains a determination to be made by parole authorities, parole eligibility is now a function of the sentence received. In effect, this decision has become a judicial responsibility to be exercised at the time of sentencing and within the bounds set by the Legislature. Defendants convicted of crimes can be required to serve a mandatory minimum term before they can be considered for parole. See, *e.g., N.J.S.A.* 2C:11–3(b); *N.J.S.A.* 2C:43–6.

Our State's parole process has also undergone significant changes to complement the Code's sentencing scheme. In recognition of the more definite and severe sentences to be imposed under the Code, the Legislature reformulated the Parole Act to reduce the discretion involved in parole decisions. The Act, in effect, eliminated the conventional parole discretion

relating to adequacy of punishment, which discretion the Legislature transferred substantially to the judiciary as a function of its sentencing authority under the Code. The longer sentences and mandatory minimum terms anticipated under the Code serve to insure that the punitive aspects of the inmate's sentence will be satisfied by the time parole eligibility arrives. Hence, parole decisions for inmates sentenced under the Code cannot—and need not—take into account or be based upon whether the punitive aspects of a sentence as such have been satisfied as an independent and separate ground for granting or withholding parole.[6] The parole decision must be confined solely to whether there is a substantial likelihood for a repetition of criminal behavior.

The new Parole Act specifically provides that the parole eligibility dates for pre-Code sentenced inmates are governed by the former statute. *N.J.S.A.* 30:4–123.51(j). See *N.J.S.A.* 30:4–123.11 (repealed). Thus, for an inmate, such as Trantino, sentenced to life imprisonment, the parole eligibility date arose after 25 years, "less commutation time for good behavior and time credits earned and allowed by reason of diligent application to work assignments." Nevertheless, substantive parole determinations regarding such inmates are to be made by applying the new Act's parole fitness standard. *N.J.S.A.* 30:4–123.46. Viewed in this light, the difference between these two classes of inmates—those sentenced pre-Code and those sentenced post-

---

[6]This legislative purpose is evidenced by the statement accompanying the Parole Act, *viz*:

This bill would require the authorities to show that the inmate is likely to commit a crime if he is released on parole. This shift accords with the existing practicalities of parole procedure, *complements the generally longer sentences of the new Criminal Code*, and renders the process more objective and consistent.... *[T]his shift complements the longer sentences of the Code in further moving the power to incarcerate, the power to decide how long a convict should serve in order to satisfy the punitive and retributive aspects of a sentence, from the parole process to the sentencing process.* (emphasis added) [Assembly Committee Statement to Assembly No. 3039 (1979)]

Code—becomes glaringly apparent. Inmates serving sentences under the Code—post-Code inmates—will have presumptively satisfied all punitive aspects of their sentences at the time they become eligible for parole. This is not true of pre-Code inmates. The punitive aspects of their sentences will not necessarily have been fulfilled by the time parole eligibility has occurred.[7]

Trantino argues that the Parole Act of 1979 precludes consideration of the punitive aspects of an inmate's sentence, regardless of whether he was sentenced under prior law or under the Criminal Code. This argument fails to appreciate the several aspects of punishment in the administration of criminal justice and in the special context of parole.

On the one hand, some courts and commentators have emphasized the retributive aspects of punishment and the need to punish the inmate simply for the sake of punishment. See *State v. Ivan*, 33 *N.J.* 197, 199 (1960) (Weintraub, C. J.) (retribution is "not a favored thesis, although some still claim a need to satisfy a public demand for vengeance"); *Furman v. Georgia*, 408 *U.S.* 238, 308, 92 *S.Ct.* 2726, 2761, 33 *L.Ed.2d* 346, 389 (1972) (Stewart, J., concurring) ("I cannot agree that retribution is a constitutionally impermissible ingredient in the imposition of punishment"); *People v. Gardner*, 56 *Cal.App.*3d 91, 98 n.3, 128 *Cal. Rptr.* 101, 106 n.3 (1976) ("in the face of the modern accent on rehabilitation and deterrence . . ., a reemphasis on simple and instructive retaliation may well be in order"). Thus, while not a favored doctrine, the sufficiency of punishment served in the past as an independent basis for denying parole on the ground

---

[7]The Parole Act of 1979 has, with one exception, eliminated punitive aspects of a sentence as an independent basis for determining parole fitness. The exception concerns repeat offenders, who are made subject to the parole eligibility dates in the new Parole Act, which occur earlier in time than the parole eligibility dates of the former statute. *N.J.S.A.* 30:4–123.51(j). However, the repeat offender must remain in prison for an extended period if either the prosecutor or sentencing judge objects to his release on the ground that the punitive aspects of the sentence have not been satisfied. *Id.* See *N. J. State Parole Board v. Byrne*, 182 *N.J.Super.* 540 (App.Div.1982).

that the crime itself demanded a longer incarceration. See, *e.g.,* *Beckworth,* 62 *N.J.* at 353 (affirming parole denial that had been based on the Board's conclusion that both "the punitive and deterrent aspects of * * * sentence have not been fulfilled."). See generally *Redmount,* "Some Basic Considerations Regarding Penal Policy," 49 *Journal of Criminal Law, Criminology and Police Science* 426 (1959); "Sentencing: Is There a Better Way?," 90 *N.J.L.J.* 340 (1967).

There is another aspect of punishment that has great pertinency in the context of sentencing and parole. Punishment serves broad societal purposes and needs relating to general deterrence, which entails deterring other persons from committing crimes. See *State in the Interest of C. A. H. and B. A. R.,* 89 *N.J.* 326, 334–35 (1982); *State v. Jones,* 66 *N.J.* 563, 568 (1975); *Ivan,* 33 *N.J.* at 199–200. Punishment also serves the ends of individual deterrence, which entails dissuading the individual offender from committing future crimes. See, *e.g., C. A. H. and B. A. R.,* 89 *N.J.* at 334–35; *Jones,* 66 *N.J.* at 568; *Ivan,* 33 *N.J.* at 199–200; *United States v. Bergman,* 416 *F.Supp.* 496, 499 (S.D. N.Y.1976). See generally *Zimring & Hawkins, Deterrence* (1973); Andenaes, "The Morality of Deterrence," 37 *U.Chi.L. Rev.* 649 (1970); Hart, "The Aims of the Criminal Law," 23 *Law and Contemporary Problems* 401 (1958). In this respect, the punitive aspect of a sentence is relevant to rehabilitation in the sense that it tends to insure that the individual inmate will not be likely to commit future crimes. See *State v. Lavelle,* 54 *N.J.* 315, 327 (1969) (Weintraub, C. J., concurring) (imposition of fine was part of prisoner's punishment, and payment of that fine was a "necessary precondition for a release compatible with the welfare of society"); *Buehrer,* 50 *N.J.* at 509 (in the context of probation, court rejected argument that assumed "punishment and rehabilitation are somehow incompatible. Of course they are not . . . Punishment and rehabilitation are not antagonists . . . Probation [which] has an inherent sting . . . [is] realistically punitive in quality [and] is meant to serve the overall public

interest as well as the good of the immediate offender"); *State v. Davis*, 175 *N.J.Super.* 130, 145 (App.Div.1980) (rejecting an inmate's claim that under the former parole law good time and work credits qualified him for parole before he had served the mandatory minimum sentence of 15 years under the new Code); *State v. Wright*, 156 *N.J.Super.* 559, 562 (App.Div.1978) ("[p]unishment and rehabilitation are not necessarily incompatible"). See also *State v. Lancaster*, 550 *P.*2d 1257, 1259 (Alaska 1976) ("The fact that a criminal should be rehabilitated, if possible, does not mean that he should escape punishment for his misdeeds. The very opposite may be true. Penalties must be imposed in most instances in order to make rehabilitation effective, as well as to protect the public and deter others from engaging in criminal conduct"); *People v. Carroll*, 76 *Ill.App.*2d 9, 12–13, 221 *N.E.*2d 528, 530 (1966) ("The ideal sentence is one which adequately punishes the offender for his misconduct, safeguards the public from further offenses, and reforms and rehabilitates the offender into a useful member of society").

In recognizing that the Legislature intended to reduce or eliminate consideration of the punitive aspects of sentencing from substantive parole decisions under the Parole Act, it is important to distinguish the several roles that traditionally were ascribed to punishment. In this frame of reference, it is fair to conclude that the Legislature has effectively removed punishment from parole only in the sense of societal retribution and deterrence. Clearly, in these terms, the punitive aspects of a sentence may no longer be considered as an independent ground for denying parole under the Parole Act of 1979. Because the individual's likelihood of recidivism is now the sole standard for making parole determinations, *N.J.S.A.* 30:4–123.53(a), punishment that serves society's need for general deterrence or a concern for retribution is not truly relevant.

Contrary to Trantino's assertions, the Parole Act does not prevent consideration of the punitive aspects of a pre-Code inmate's sentence as they relate to the rehabilitative prospects of the inmate and his likelihood of recidivism if released. As

noted, a well recognized purpose of punishment is individual deterrence. Hence, the punitive aspects of a sentence are extremely relevant in terms of the inmate's rehabilitation. See, *e.g., Buehrer*, 50 *N.J.* at 509.

In this case the Parole Board originally considered whether the punitive aspects of Trantino's sentence had been satisfied. It specifically concluded in March 1979 that these punitive aspects had not been met and denied parole for that reason. It reached the identical conclusion one year later in March 1980. Thereafter, the Parole Board considered itself bound by the new Parole Act and apparently believed that it had no legal authority under the prescribed standard to consider the punitive aspects of Trantino's sentence. In this respect the Parole Board erred. We now hold that, at least with respect to pre-Code sentenced inmates such as Trantino, while the Parole Board may not determine parole release or fitness solely on grounds of the adequacy of the punishment reflected in the inmate's prison term, the Board must consider whether the punitive aspects of a sentence have been satisfied in terms of the rehabilitative potential of the inmate. Thus, on remand in this case, the Board must reassess the punitive aspects of Trantino's sentence in considering the extent of his rehabilitation and his fitness for parole.

On this critical point it is necessary to underscore the gravity of Trantino's underlying crimes since the seriousness of the offense is the main factor that creates the need for punishment. See *C.A.H. and B.A.R.*, 89 *N.J.* at 338. Throughout these proceedings, and presumably at the present time, the Parole Board has appropriately been fully mindful of the enormity of Trantino's crimes. It took pains to point out in its decisions that the imposition of restitution was not intended to deprecate the gravity of the offense. While the gravity of the crime may not now be considered an independent reason for continuing punishment and denying parole, the Parole Board must nevertheless weigh the seriousness of the crime as an

element in determining whether the offender's punishment has been adequate to insure his individual progress toward rehabilitation.

It suffices in this regard simply to underscore that of which the Board is already well aware. In this case the murders for which Trantino was convicted were particularly heinous. Trantino was given the harshest sentence possible—the death penalty. Trantino's offense was as cold-bloodedly vicious and wantonly brutal as other notorious capital cases. See, *e.g., State v. Funicello,* 49 *N.J.* 553 (1967), *cert.* den., 390 *U.S.* 911, 88 *S.Ct.* 837, 19 *L.Ed.*2d 882 (1968) (defendant killed a used car dealer by repeatedly stabbing and slashing him and then drove off with a car); *State v. Billingsley,* 46 *N.J.* 219 (1966) (defendant, while intoxicated, killed two women by beating and repeatedly stabbing them); *State v. Forcella,* 35 *N.J.* 168 (1961), *cert.* den. 369 *U.S.* 866, 82 *S.Ct.* 1035, 8 *L.Ed.*2d 86 (1962) (quarrel between former lovers ended with apparently intoxicated defendant shooting his lover to death at close range with a shotgun).

In considering Trantino's fitness for parole release, the egregiousness of his crime and the harsh sentence imposed obligate the Parole Board to weigh most scrupulously and conscientiously whether Trantino has been punished sufficiently for it to conclude with confidence that he has been rehabilitated and will not commit future crimes.[8] Furthermore, in this regard it cannot be claimed that pre-Code inmates such as Trantino are being treated unfairly in comparison to inmates sentenced under the Code. If Trantino had been convicted and sentenced under the Code, it

---

[8]In this context—the sufficiency of punishment as an ingredient in the rehabilitative prospects of the offender—the observations of the dissenting members of the Parole Board take on particular cogency. In their view Trantino had not been sufficiently punished. They noted that his behavior and attitude still strongly suggested a lack of contrition, defiance of authority, uncooperativeness, which, coupled with an early institutional history of infractions, did not justify a conclusion that there was no likelihood of repeated criminal acts. Under these circumstances it is hard to imagine that Trantino has been sufficiently punished to be considered rehabilitated.

is almost certain he would not yet be eligible for parole and probably would not become eligible for many years to come.[9] Hence, the Parole Board's obligation to scrutinize the adequacy of Trantino's punishment in relation to his progress toward rehabilitation should be regarded as a continuing one.

One further point must be discussed in connection with the parole hearing remand. While the parole proceeding is initiated by an informational report submitted by correctional personnel, *N.J.S.A.* 30:4–123.54(a), a hearing before a panel of the Board must be held if "more information is needed," *N.J.S.A.* 30:4–123.55. If, as in this case, parole proceedings advance to the hearing stage, indicating a need for additional information, the Parole Board may and should affirmatively seek, as well as encourage, the submission of relevant evidence, testimonial and otherwise, bearing upon the essential elements of parole.

The Parole Board is required by statute to notify the appropriate prosecutor, the Attorney General and any other criminal justice agencies whose information and comment may be relevant as to the necessity or desirability of an inmate's parole. *N.J.S.A.* 30:4–123.45(b)(5). Because the Board's objective is to reach a reasoned and informed determination, it should permit the participation of parties and witnesses who can bring relevant evidence to bear upon the parole question. The Legisla-

---

[9]In its decision of December 1981 conditionally admitting Trantino to parole, the Parole Board itself recognized that under current law he "would likely have served 50 or more years of incarceration." This appears to be a substantially accurate estimate. Under the Code, Trantino could have received a life sentence, with the earliest possible parole date coming after 25 years in prison. *N.J.S.A.* 2C:11–3(b); 2C:43–7(a)(1). This is because the crime of murder is subject to a discretionary extended term of life imprisonment, even without separate proof of any of the specific enhancement criteria provided for other offenses under *N.J.S.A.* 2C:44–3. See *State v. Maguire*, 84 *N.J.* 508 (1980). Since Trantino was guilty of two murders, he might also have received a second sentence, to run consecutively, of either life imprisonment or 30 years with a minimum term of 15 years before becoming parole eligible. See *N.J.S.A.* 2C:11–3(b); 2C:44–5(a). Thus, if he had been sentenced under the Code, Trantino might have had to stay in prison for 40 or perhaps even 50 years before he would have become eligible for parole.

ture has already indicated that the prosecutor can perform a special role in parole proceedings. See *N.J.S.A.* 30:4–123.51(j) (giving prosecutor the right to defer the parole release of a pre-Code sentenced inmate who is a repeat offender whenever the prosecutor advises the Board that the punitive aspects of the inmate's sentence have not been satisfied). Those persons required by statute to be notified of parole proceedings, such as the Attorney General or county prosecutor, are parties familiar with the offender and the offense and can be helpful in the parole proceedings. Their role is to inform the Board. Such persons, upon request and subject to the discretion and control of the Parole Board, should be allowed to submit evidence, to give testimony, examine and cross-examine witnesses, and present argument on all matters directly relevant to the parole of the inmate.

The nature and extent of such participation must, of course, be in accordance with such constraints as may be imposed by the Parole Board. Such restrictions must insure that parole proceedings remain primarily informational rather than adversarial. Procedural regulations must be designed so that parole hearings are not only genuinely informative on the ultimate question of the inmate's parole fitness but also expeditious and unencumbered by the introduction of extraneous issues.

Furthermore, it is undeniable that public outrage over an imminent parole determination, such as that which has occurred in this case, has no place in a parole proceeding and is to be given no weight in a parole decision. *Cf. State v. Humphreys*, 89 *N.J.* 4 (1982); *Id.* at 17 (Pashman, J., dissenting) (both majority and dissent concluded that public opinion must not be permitted to influence outcome of criminal diversion proceeding). The Board therefore can implement appropriate rules governing its deliberations to assure that causes before it do not become sensational adversarial contests.

## IV

In sum, we hold that the Parole Board may consider the imposition of restitution as a condition of parole for an inmate convicted of homicide. If restitution is imposed as a parole condition, its elements must be determined by the Parole Board, and the amount of such restitution as so defined will then be fixed by the court upon the request of the Board as required by the Parole Act. The Parole Board should understand that such restitution must be set within narrow limitations so that restitution truly fits the criminal and the crime and constitutes an effective tool for rehabilitation. It cannot be used in a manner that will destroy the certainty and predictability of parole and the efficiency of the parole process.

We hold further that the Parole Board is authorized to reconsider and redetermine Trantino's fitness for parole. In that connection the Board is specifically directed to seek affirmatively all relevant evidence and to permit the participation of interested parties, subject to procedural regulations designed to control and direct the parole proceedings properly. In its reconsideration, the Parole Board must determine if the punitive aspects of Trantino's sentence have been satisfied such that he is truly rehabilitated and is not likely to commit crimes in the future. On this point—the sufficiency of punishment—the Parole Board may consider the kind of sentence that the inmate would likely have received under the present Code of Criminal Justice for the crimes which he committed. If the Board determines that Trantino has not been punished sufficiently and, for that reason, as well as any others, it appears by a preponderance of the evidence that there is a substantial likelihood of future criminal activity if he is released, the Parole Board must deny Trantino parole.

Accordingly, the judgment below is modified and the matter remanded to the Parole Board to proceed in accordance with this opinion.

For modification and remandment—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*Opposed*—None.