```
┌─────────────────────────────────────────────────┐
│        NOT FOR PUBLICATION WITHOUT THE            │
│        APPROVAL OF THE APPELLATE DIVISION         │
│                                                   │
│  This opinion shall not "constitute precedent or be binding upon any court." │
│  Although it is posted on the internet, this opinion is binding only on the  │
│   parties in the case and its use in other cases is limited. R.1:36-3.       │
└─────────────────────────────────────────────────┘
```

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3428-14T3

PRINCETON BATTLEFIELD AREA
PRESERVATION SOCIETY, A New
Jersey Not-For-Profit
Corporation, ASHER LURIE, KIP
CHERRY, JERALD HURWITZ, MARK
CROSBY, SALLY CROSBY, WILLIAM
MARSCH, IAIN HAIGHT-ASHTON,
KIM GALLAGHER, JOSEPH CARNEY,
MRS. CARNEY, RICH PATTERSON,
PAUL LUANE, BILL MEYER, and
GLENN WILLIAMS,

    Plaintiffs-Appellants,

v.

INSTITUTE FOR ADVANCED STUDY
and DELAWARE AND RARITAN
CANAL COMMISSION,

    Defendants-Respondents.

_____

Submitted October 25, 2016 — Decided [1] July 7, 2017*

Before Judges Messano, Espinosa, and Guadagno.

_____

[1] Shortly after this opinion was submitted to the Clerk's office for filing in early December 2016, respondent filed a motion to stay appellate proceedings. By order entered January 4, 2017, we granted a stay on the condition that the Clerk's office was to file and release the opinion on June 30, 2017, unless a fully executed stipulation of dismissal was received, and the opinion is now being filed and released.

On appeal from the Delaware and Raritan Canal Commission, Docket No. 14-3791B.

Bruce I. Afran, attorney for appellants.

Stevens & Lee, P.C., attorneys for respondent Institute for Advanced Study (Bradley L. Mitchell and Christopher S. Tarr, on the brief).

Christopher S. Porrino, Attorney General, attorney for respondent Delaware and Raritan Canal Commission (Melissa Raksa, Assistant Attorney General, of counsel; Melissa P. Abatemarco, Deputy Attorney General, on the brief).

PER CURIAM

The Princeton Battlefield Area Preservation Society (the Society) and a number of individuals (collectively, appellants) appeal from the final agency decision of the Delaware and Raritan Canal Commission (the Commission) approving a development application submitted by the Institute for Advanced Study (the Institute). We briefly provide the salient factual and procedural history.

The Institute is a private, independent, postgraduate center for theoretical research located on 589 wooded and farmland acres in Princeton. The Commission was "established in the Department of Environmental Protection" (DEP), N.J.S.A. 13:13A-11(a), under the Delaware and Raritan Canal State Park Law of 1974, N.J.S.A. 13:13A-1 to -15. The Legislature directed the Commission to

"preserve, maintain, improve, and enlarge" the Park, N.J.S.A. 13:13A-2(b), prepare and implement a master plan for the Park's physical development, N.J.S.A. 13:13A-2(b) and -11(h), protect the Park from local zoning, N.J.S.A. 13:13A-2(a), and "coordinate and support activities by citizens' groups to promote and preserve the park." N.J.S.A. 13:13A-11(h).

The Legislature authorized the Commission to establish a "region appertaining to and including the [P]ark" within which it "shall review and approve, reject, or modify" all private and public development projects. N.J.S.A. 13:13A-3(f); N.J.S.A. 13:13A-11(h); N.J.S.A. 13:13A-13(d); N.J.S.A. 13:13A-14(b) and (c); N.J.A.C. 7:45-1.1. See Infinity Outdoor, Inc. v. Del. & Raritan Canal Comm'n, 388 N.J. Super. 278, 285 (App. Div. 2006) (The Commission "is assigned the responsibility to delineate zones in which it reviews all private and public projects that may affect the Park," and is the "ultimate administrative arbiter of any project within the review zone."). By regulation, the Commission's reviewing authority includes Zone A, areas within 1000 feet on either side of the center line of the Delaware and Raritan Canal, and Zone B, areas more than 1000 feet from the Canal. N.J.A.C. 7:45-1.3. The Institute's property is located in Zone B.

Beginning in 2012, the Institute embarked upon a plan to develop permanent faculty housing near its campus. After a prior

proposal was rejected in 2014, the Commission's staff accepted as complete the Institute's renewed application on January 16, 2015, which is the subject of this controversy. The plan contemplated construction of seven single-family homes and two four-unit townhouses west of the campus. The site bordered Princeton Battlefield State Park on the west and preserved open space on the south. In addition to the residences, the application anticipated construction of a 1000-foot-long asphalt cul-de-sac, sidewalks, a retaining wall, a wetland stormwater management basin, and a stormwater conveyance system consisting of grassed swales along the proposed roadway's edge. Concluding the project met applicable regulatory standards, the staff recommended approval, and the Executive Director submitted the application to the Commission for action at its January 21, 2015 meeting.

Six of the seven appointed commissioners attended the meeting. Appellants objected to the destruction of areas of mature trees and presented expert testimony regarding the project's detrimental impact to an unnamed water tributary and its associated forested wetlands and stream corridor. In particular, appellants argued the retaining wall would encroach into the stream corridor, and they urged the commissioners to consider its potential impacts. The Institute presented expert testimony that rebutted appellants' claims.

Commissioner Mark Texel, the Director of DEP's Division of Parks and Forestry, State Park Service, sat on the Commission as the DEP Commissioner's designee, N.J.S.A. 13:13A-11(a)(1). Texel posed a question regarding the visual impact of the development on the historical battlefield park. The Institute indicated it would create a visual buffer by planting evergreens and would further protect the area by way of a conservation easement.

Texel went on to explain that he had voted against the Institute's application in 2014 because it proposed an encroachment into the tributary's stream corridor and sought a waiver from the Commission's regulations. Stating that he was "taking off his hat as a Commissioner" and expressing his personal feelings, Texel said he agreed with the Society's president, who had testified about the importance and historical significance of preserving the Princeton Battlefield. Texel also expressed agreement with the Commission's vice chairman, who stated that, "as a private citizen," he would prefer the site not be developed, but the application was "compliant" with all regulations.

Ultimately, Texel abstained from voting. Because two other commissioners voted against the application, the Institute's proposal failed to garnish the required four affirmative votes for approval.

Although details are unclear from the record, Texel apparently requested that the Commission reconsider the application. Notice of the Commission's February 18, 2015 meeting included an agenda listing a motion for reconsideration of the Institute's application. All seven commissioners attended the February 18 meeting.

In moving for reconsideration, Texel stated he "was . . . prepared to vote in favor of approving th[e] proposal at [the] January 21, 2015 meeting[]" because it fully complied with the Commission's regulations. However, Texel explained:

> As you recall at last month's meeting, I abstained from voting on the motion . . . to approve the proposal. I did so based on comments by our Commissioners prior to the roll call vote that there were already sufficient votes in support of the proposal for it to pass without my vote needed. Therefore, I chose to abstain from voting out of respect for the objector . . . who has been a very strong and faithful nonprofit partner in the State Park Service. However, I believe the appropriate outcome is that this project be approved because it does comply with the . . . Commission's regulations. Therefore, . . . I respectfully request reconsideration of the proposal so that I may cast my vote in support of it.

The commissioner who had been absent from the January meeting announced he had reviewed the testimony of that meeting and was now prepared to vote on the merits of the application.

Appellants objected. The Society's counsel argued the Commission lacked the authority to sua sponte reconsider its prior action. He further claimed that the Commission's regulations provided no authority for reconsiderations and that no one had alleged fraud or mistake of law or fact.

The commissioners voted to approve Texel's motion for reconsideration, and then opened the meeting to new public comment on the Institute's application. The Commission's vice chairman explained that all comments from the prior month's meeting also would be considered.

The Society's counsel contended that the Commission's staff had failed to consider the adverse impact of construction on the stream corridor, something he asserted was required by regulation even if there were no actual construction within the corridor. The Commission's Executive Director refuted this claim, noting that review of any impact was only required when a project actually encroached into the stream corridor.

By a vote of five-to-two, the Commission approved the Institute's application, with Texel voting in the affirmative. The Commission issued a certificate of approval subject to certain conditions on February 18, 2015. This appeal ensued.

Appellants argue we should vacate the Commission's approval because, absent a showing of fraud or material change in facts or applicable law, it had no authority to reconsider the January 2015 vote simply to permit a commissioner, who had abstained for well-considered policy reasons, to now cast a vote. Appellants contend permitting reopening of the application "injures the public interest and violates public policy." These arguments present purely legal questions which are subject to our de novo review. Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot., 191 N.J. 38, 48-49 (2007).

We begin by recognizing an "agency's authority encompasses all express and implied powers necessary to fulfill the legislative scheme that the agency has been entrusted to administer." In re Application of Virtua-W. Jersey Hosp. Voorhees for Certificate of Need, 194 N.J. 413, 422-23 (2008). Although the agency's exercise of authority through "inherent or implied power is not boundless," N.J. Dep't of Labor v. Pepsi-Cola Co., 170 N.J. 59, 61 (2001), our courts have long recognized that an administrative agency has inherent power to reconsider, reopen and rehear prior decisions in the absence of any legislative restriction to the contrary. In re Kallen, 92 N.J. 14, 24 (1983); In re Parole Application of Trantino, 89 N.J. 347, 364 (1982); Handlon v. Town of Belleville,

4 N.J. 99, 106-07 (1950). See also E. H. Schopler, Annotation, Power of Admininstrative Agency to Reopen & Reconsider Final Decision as Affected by Lack of Specific Statutory Authority, 73 A.L.R. 2d 939, 943-46 (1960) (discussing cases).

Appellants claim, however, that in the absence of fraud or a material change in facts or law, an agency cannot exercise its inherent power simply because one of its members had a change of heart. They rely largely upon our decision in Trap Rock Industries, Inc. v. Sagner, 133 N.J. Super. 99, 112-13 (App. Div. 1975), aff'd by equally divided court, 69 N.J. 599, 600 (1976).

There, following divestment by a previously-convicted corporate principal, the Commissioner of the Department of Transportation (DOT) conducted an administrative hearing and reinstated the plaintiff-corporation as a qualified bidder on DOT projects. Id. at 102-03. More than one year later and after the plaintiff had been awarded a substantial DOT contract as the lowest bidder, the successor Commissioner conducted another hearing based upon the corporate plaintiff's guilty plea to federal tax violations. Id. at 103-05. He debarred the plaintiff based upon this subsequent development. Id. at 104-05. We recognized that the Commissioner was entitled to investigate whether the plaintiff was a responsible bidder, id. at 106, but we found he erred in concluding the corporation's guilty plea was grounds for debarment

because the crime was "founded upon the past deeds of individuals no longer associated with the corporation." Id. at 108.

In addressing the plaintiff's contention that the rehearing was barred by collateral estoppel or res judicata, we said:

> It is fitting . . . that, subject to statutory restrictions, . . . an administrative agency, in appropriate circumstances, have the power to reassess or reconsider its actions in order to perform fully its responsibilities as a regulatory body. In this sense, the power to reconsider, to rehear and to revise determinations may be regarded as inherent in administrative agencies. This power to reappraise and modify prior determinations may be invoked by administrative agencies to protect the public interest and thereby to serve the ends of essential justice.

> It does not follow, however, that in exercising the necessary and appropriate power to reconsider the status of a contractor as an eligible bidder the Commissioner was free to disregard completely issues that were fully and fairly resolved prior thereto. The power to reconsider must be exercised reasonably, with sound discretion reflecting due diligence, and for good and sufficient cause.

> Merely because the Commissioner has -- and should exercise -- the power to reappraise the eligibility of a qualified contractor in light of meaningful subsequent developments, as he is authorized to do by virtue of N.J.S.A. 27:7-35.8, does not mean that a relitigation of previously resolved issues is fair, appropriate or necessary. Even in the context of a reopened hearing in an administrative agency proceeding there is a proper use of res judicata or, more precisely, collateral estoppel. These principles should be invoked discriminately to serve the ends of

administrative justice. A balancing of such factors as new developments or even new evidence of old developments, the advantages of repose, party reliance, the thoroughness of the earlier decision and the showing of illegality, fraud, mistake and the like should be considered[.]

[Id. at 109-10 (citations omitted).]

In reversing, we concluded that the Commissioner "view[ed] the matter in a different and stricter light than his predecessor[,]" and, "under all of the circumstances," there was no good cause justifying "recanvassing and reconsideration . . . of the factual issues resolved in the previous proceedings . . . ." Id. at 112-13.

In our view, Trap Rock supports the general principles governing agency reconsideration already discussed, and does not, as appellants assert, confine exercise of an agency's inherent power to a narrow set of circumstances involving fraud or a material change of fact or law. Rather, as we have subsequently made clear, "[t]he only limitations are the considerations of reasonableness, fairness and good cause." In re 1982 Final Reconciliation Adjustment for Jersey Shore Med. Ctr., 209 N.J. Super. 79, 92 (App. Div. 1986) (citing Trantino, supra, 89 N.J. at 364; Trap Rock, supra, 133 N.J. Super. at 109-10); See also Duvin v. State, Dep't of Treasury, Public Emps.' Ret. Sys., 76 N.J. 203, 207 (1978) (recognizing the agency's power "to reopen

11

or to modify and to rehear orders previously entered by it . . . should be invoked only for good cause shown[, and] . . . must be exercised reasonably, and . . . with reasonable diligence").  "Good cause may be established by showing that reopening proceedings would 'serve the ends of essential justice and the policy of the law[.]'"  In re Van Orden, 383 N.J. Super. 410, 421 (App. Div. 2006) (quoting Handlon, supra, 4 N.J. at 107).

In discussing limitations on administrative reconsideration, the Court in Ruvoldt v. Nolan, 63 N.J. 171, 183-85 (1973), held that one of the factors to be considered was the timing of the review, as this impacts the extent of reliance by affected individuals and the equities of the case.  "The limitation of reasonable diligence in reopening prior administrative determinations has been recognized in cases decided since Handlon[.]"  Skulski v. Nolan, 68 N.J. 179, 195 (1975).  The Court explained that "equitable considerations are relevant in evaluating the propriety of conduct taken after substantial reliance by those whose interests are affected by subsequent actions."  Id. at 198.

In this case, the Commission's rehearing took place twenty-eight days after the January 2015 vote.  Notably, appellants could not have relied upon the finality of the January vote.  N.J.A.C. 7:45-7.1 states:

(a) Subject to the limitations of (h) below, a person, including a municipality, county, or municipal or county approving agency, may request an adjudicatory hearing to contest a decision on an application for an individual approval . . . .

(b) To contest a decision listed at (a) above, a person shall submit a hearing request within 30 calendar days after receipt of the notice of decision . . . .

. . . .

(e) The Commission shall notify the requester in writing if the request for a hearing is granted and, if denied, the reasons why. If a hearing request is granted, the Commission shall refer the matter to the Office of Administrative Law for an adjudicatory hearing . . . .

(f) At the conclusion of any adjudicatory hearing . . . , the administrative law judge will submit an initial decision to the Commission. The Commission shall issue a final decision affirming, rejecting or modifying the initial decision . . . .

Therefore, pursuant to this regulation, had the Institute requested and been granted an adjudicatory hearing, regardless of its outcome, the Commission would have had another opportunity to reconsider and vote to approve the Institute's project. Appellants could not have relied upon the results of the January vote as the final word on the Institute's application.[2]

---

[2] N.J.A.C. 7:45-7.1(h) states that "[n]othing in this section shall be construed to provide a right to an adjudicatory hearing in

Here, Texel moved for reconsideration following a mistaken belief he held in January that his vote was unnecessary to approve the Institute's application. As he later revealed, he understood at the time of the January meeting that the application fully complied with the Commission's regulatory scheme. He abstained, not in furtherance of his role as a commissioner, but, rather, out of deference to the Society's laudable public service and DEP's general support for its goals. We do not condone this reasoning, nor what occurred as a result, i.e., reconsideration at a subsequent meeting. However, in light of the inherent power of the Commission to reconsider its prior actions to "serve the ends of essential justice and the policy of the law," Handlon, supra, 4 N.J. at 107, we see no reason to reverse.[3]

---

contravention of the Administrative Procedure Act [(APA)], N.J.S.A. 52:14B-3.1 through 3.3." Appellants are considered third-party objectors under the APA. N.J.S.A. 52:14B-3.2. Although "the APA does not foreclose such third parties from seeking judicial review of the merits of a permit once it is issued by an agency," In re Riverview Dev., LLC, 411 N.J. Super. 409, 425 (App. Div.), certif. denied, 202 N.J. 347 (2010), it bestows no automatic right to a formal administrative hearing to contest the issuance of a permit unless the third-party objector can establish a statutory or constitutional right to that hearing, In re Freshwater Wetlands Statewide Gen. Permits, 185 N.J. 452, 463-64 (2006). We conclude that appellants were not required to ostensibly exhaust administrative remedies by seeking review under N.J.A.C. 7:45-1 before filing this appeal.

[3] We hasten to add that appellants have understandably not argued Texel had a disqualifying interest in the proceedings. See, e.g.,

A-3428-14T3

Appellants separately argue that the Commission's actions "injure[] the public interest and violate public policy." For the reasons already expressed, we disagree. The argument requires no further discussion. R. 2:11-3(e)(1)(E).

II.

The Commission's regulations define a stream corridor as

> any water course that flows into the Park, its tributaries, the 100-year floodplain associated with the water course and its tributaries, and all of the land within a 100-foot buffer adjacent to the 100-year flood line associated with the water courses and their tributaries. . . . A stream corridor starts from the point that the water course enters the Park, upstream to the point that the water course or its tributaries drain less than 50 acres.
>
> [N.J.A.C. 7:45-1.3.]

Pursuant to N.J.A.C. 7:45-9.1, projects that "include[] a portion of a stream corridor" must be reviewed for "stream corridor impact." N.J.A.C. 7:45-9.3 prohibits certain uses in a stream corridor, such as construction of new structures, N.J.A.C. 7:45-9.3(a)(1). To avoid the Commission's strict adherence to this regulation or to any of its other review standards, applicants can request a waiver under the procedures set forth in N.J.A.C.

---

Thompson v. City of Atl. City, 190 N.J. 359, 374 (2007) ("It is the potential for conflict, rather than proof of an actual conflict or of actual dishonesty, that commands a public official to disqualify himself from acting on a matter of public interest.").

7:45-12.1 to -12.9. The Institute's 2014 application proposed encroachments in a stream corridor, necessitating a waiver pursuant to N.J.A.C. 7:45-12.4. The Commission rejected the Institute's 2014 application citing the encroachments as a reason.

In evaluating the current application, the Commission's staff considered compliance with various regulatory standards governing storm water and groundwater impacts. N.J.A.C. 7:45-8.4 to -8.7. The staff also concluded: "The proposed development is located outside of the delineated stream corridor. Since no development is located within the stream corridor, the project is not subject to stream corridor review pursuant N.J.A.C. 7:45-9."

Appellants argue that even if reconsideration had been appropriate, the Commission "acted under a misunderstanding of [its] jurisdiction . . . to review . . . Zone B projects." Although the experts and the Commission's staff all agreed that the proposed development would not encroach into the unnamed tributary's delineated stream corridor, appellants rely upon N.J.A.C. 7:45-2.3, which governs the Commission's general scope of review for approvals, authorizations and waivers. That regulation provides:

> (a) In the Review Zone, the Commission shall review governmental and private projects that have the potential to cause an adverse impact on the Park including drainage, aesthetic, historic and ecological

16

impacts . . . . Each project . . . will be reviewed for its conformance with the objectives of the Master Plan and with the specific standards of this chapter. <u>Review will address four specific types of impact</u>:

1. Stormwater runoff and water quality impact;

2. <u>Stream corridor impact</u>;

3. Visual, historic and natural quality impact; and

4. Traffic impact.

. . . .

(c) In each case, <u>the scope of review will depend upon the size and location of the project</u>, as follows . . . :

. . . .

2. <u>In Zone B</u>:

i. <u>Each major project is reviewed</u> for stormwater runoff and water quality impact, and <u>for stream corridor impact</u>; and

ii. Any major project within one mile of any portion of the Park and having direct access to a road that enters Zone A is reviewed for traffic impact.

[<u>N.J.A.C.</u> 7:45-2.3 (emphasis added).]

Appellants contend this regulation required the Commission to consider impacts upon the stream corridor of the unnamed tributary. We disagree.

"[W]e must extend substantial deference to an agency's interpretation and application of its own regulations, particularly on technical matters within the agency's special expertise." Pinelands Pres. All. v. State, Dep't of Envtl. Prot., 436 N.J. Super. 510, 524 (App. Div.) (citing In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 488-89 (2004)), certif. denied, 220 N.J. 41 (2014). However, "[w]hen 'the issue involves the interpretation of statutes and regulations, it is a purely legal issue, which we consider de novo.'" Id. at 524-25 (quoting Klawitter v. City of Trenton, 395 N.J. Super. 302, 318 (App. Div. 2007)).

"'Regulations are subject to the same rules of construction as a statute,' and 'should be construed in accordance with the plain meaning of [their] language' 'and in a manner that makes sense when read in the context of the entire regulation.'" Seigel v. N.J. Dep't of Envtl. Prot., 395 N.J. Super. 604, 618 (App. Div.) (quoting Medford Convalescent & Nursing Ctr. v. Div. of Med. Assistance & Health Servs., 218 N.J. Super. 1, 5 (App. Div.), certif. denied, 102 N.J. 385 (1985)), certif. denied, 193 N.J. 277 (2007). "In the context of statutory interpretation, we are advised that: 'Statutes that deal with the same matter or subject should be read in pari materia and construed together as a unitary and harmonious whole.'" Scott v. N.J. Dep't of Corr., 416 N.J.

Super. 512, 518 (App. Div. 2010) (quoting Marino v. Marino, 200 N.J. 315, 330 (2009)). If there is an inconsistency between two or more regulations, a more specific provision usually controls over a more general one. Id. at 519.

In this case, N.J.A.C. 7:45-2.3(c)(2) is a regulation of general application setting forth the types of potential review for development proposals within Zone B. However, N.J.A.C. 7:45-9.1 expressly requires consideration of stream corridor impact only "if the project includes a portion of a stream corridor." This specific regulation controls the more general one, and the Commission was not required to consider impacts on the stream corridor of the unnamed tributary because the Institute's project did not include a portion of the stream corridor.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3428-14T3