**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1357-24

JAMIE PANDURE,

     Appellant,

v.

NEW JERSEY STATE
PAROLE BOARD,

     Respondent.

_____

Submitted March 10, 2026 – Decided June 5, 2026

Before Judges Gooden Brown and Torregrossa-O'Connor.

On appeal from the New Jersey State Parole Board.

Jamie Pandure, self-represented appellant.

Jennifer Davenport, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Dorothy M. Rodriguez, Deputy Attorney General, on the brief).

PER CURIAM

Appellant, Jamie Pandure, appeals from the New Jersey State Parole Board's (Board) October 30, 2024 final agency decision denying him parole and establishing a thirty-six-month future eligibility term (FET). Pandure argues the Board arbitrarily and improperly relied almost exclusively upon its perception Pandure lacked insight into his offense or remorse for his actions, failing to fairly consider the totality of relevant factors, in concluding there was a "substantial likelihood" he would reoffend if released on parole. Having considered the record in light of applicable legal principles, we reverse and remand for a new hearing at which the Board must consider and adequately explain all relevant factors in determining whether the preponderance of the evidence establishes a substantial likelihood Pandure will reoffend.

I.

A.

Pandure, currently sixty-one years old and fifty-nine at the time of the Board's review, is presently serving a prison term of seventy-five years with a thirty-year parole ineligibility term following his 1998 conviction of conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a)(1)-(2), and criminal complicity (murder), N.J.S.A. 2C:2-6 and N.J.S.A. 2C 11-3(a)(1)-(2), for his

2

role in the 1991 murder of his wife, Wanda.[1]  Pandure, with no prior criminal history, became eligible for parole on April 12, 2024.  We derive the following summary of relevant facts and procedural history from our decision affirming on direct appeal Pandure's conviction and sentence, see State v. Pandure, No. A-1078-98 (App. Div. July 25, 2001), and the record before the Board.

Pandure was twenty-six years old on July 5, 1991, when his twenty-two-year-old wife was found dead—shot three times in the face at close range—at the medical office where she worked as a receptionist.  She was shot after office hours while awaiting Pandure's mother's arrival to drive her home, after Pandure advised her to wait inside the office rather than outside the building as she typically did.  There were no signs of forced entry.

The killing remained unsolved for a year and a half, until an inmate in the county jail, housed with Pandure's brother-in-law, Francis Richard Bennett, informed law enforcement of statements Bennett made causing further investigation.  Specifically, investigators interviewed witnesses who recounted defendant's purchasing from a drug dealer a .38 caliber handgun around the time

---

[1]  For clarity, due to their shared surname, and intending no disrespect, we refer to Wanda Pandure by her first name, and Jamie Pandure's brother, Joseph "Joel" Pandure, by the name Joel, as he is referenced by Pandure and in the Board record.

of Wanda's shooting with the same caliber weapon. Further investigation led to the arrest of Pandure and his brother Joel for Wanda's murder.

A fellow inmate then advised investigators Pandure admitted that he, Joel, and Bennett, plotted to murder Wanda, motivated by a desire for Wanda's life insurance proceeds and her affair with Joel. Wanda, earning only $20,000 a year was insured after marrying Pandure with three separate life insurance policies from which Pandure was the beneficiary of nearly $300,000.[2] In addition, Pandure's cellmate told investigators Pandure arranged to have the cellmate kill potential trial witnesses including his former girlfriend, Jan Gray, and those related to his purchase of the handgun. The cellmate indicated Pandure arranged for his cellmate's bail and payment by money orders, but the cellmate did not follow through.

Bennett entered a plea, which he later withdrew. Before his retraction, however, he provided a statement admitting to participating in the murder with Joel and Pandure, explaining he accompanied Joel to Wanda's office where Joel

---

[2] Two years before Wanda's murder, Pandure obtained a life insurance policy for Wanda, with an accidental death provision listing Pandure as the primary beneficiary, and Wanda's sister as the secondary beneficiary. Pandure did not obtain life insurance for himself. Around this time, Pandure and Wanda also obtained $112,500 in mortgage life insurance for Wanda and $12,081.80 in credit life insurance in connection with the couple's vehicle. An expert at trial opined Wanda was "overinsured" for her circumstances.

shot her. He told investigators Pandure became aware of Wanda's affair with Joel, Pandure and Joel discussed killing Wanda, and Bennett accompanied Pandure to purchase the gun.

Bennett was convicted of murder in a separate trial. Joel accepted a plea agreement to lesser charges and claimed at sentencing he was not the shooter and had learned about the murder from Pandure after the fact.

Pandure was indicted and tried on the following charges: two counts of conspiracy, N.J.S.A. 2C:5-2, N.J.S.A. 2C:11-3(a); two counts of conspiracy to commit murder, N.J.S.A. 2C:2-6, N.J.S.A. 2C:11-3(a); unlawful possession of a weapon, N.J.S.A. 2C:39-5b; and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). Although finding Pandure guilty of the conspiracy, and conspiring to commit murder, the jury acquitted Pandure of conspiring to kill Gray or other witnesses and of the related weapons offenses. Although there was evidence at trial indicating Pandure gave Joel $6,000 from the life insurance proceeds and transferred title of his car to Joel, the jury was unable to reach a unanimous verdict concerning whether defendant procured the murder by offer of monetary payment, removing the possibility of the death penalty.

5

B.

Incarcerated since his arrest in April 1994, Pandure became eligible for parole on April 12, 2024, after serving twenty-five years, four months, and fifteen days of his sentence. Pandure's parole assessment included information about his personal and institutional history, the nature of his offense, his parole plan if released, and a 2023 "in-depth mental health evaluation" conducted by Dr. Nakia Perry-Goffney, PsyD.[3]

Pandure's records reflect he committed four disciplinary infractions while incarcerated, contrary to N.J.S.A. 10A:4-4.1(a), including three "asterisk" offenses, which "are considered the most serious." These four violations arose from two separate incidents—one in 2004, and the second and last, now twenty years ago, in 2006. Prison records reveal, in September 2004, Pandure was found with: a "pocket pc," an "earpiece," and a "CD" (prohibited act *.009, misuse or possession of unauthorized electronic equipment); a "screwdriver bit" (prohibited act *.202, possession or introduction of a weapon); and two "CDS rolled cigarettes" (prohibited act *.203, possession or introduction of a prohibited substance). In December 2006, while Pandure was enrolled in an

---

[3] Dr. Perry-Goffney's assessment was provided in respondent's confidential appendix.

MBA program, his computer, issued for class-related use only, contained a book entitled "Sex Addict," which contravened prohibited act .452, using equipment or machinery not specifically authorized.[4]

Infraction free since 2006, Pandure participated in several programs while incarcerated, including but not limited to "Behavior Modification" in 2006; "Employment Readiness and Cognitive Behavioral Change" in 2015; "Family Reunification" in 2019; and "Focus on the Victim" in 2019. While incarcerated, he also obtained an MBA diploma and a post-graduate diploma in business, and completed courses in computer programming, personal training, and nutrition. According to Pandure, he also attended religious services regularly while incarcerated.

Pandure suffered multiple health issues, including asthma, which prevented his working while incarcerated; hip problems, requiring use of a cane; and hearing impairment, for which he wears a hearing aid. Additionally, Pandure underwent successful heart surgery in 2023 to replace a valve.

Dr. Perry-Goffney's written mental health evaluation summary noted Pandure's "independent living skills" were "well-demonstrated," referencing his

---

[4] Pandure appealed this disciplinary action, and we affirmed in Pandure v. N.J. Dep't of Corr., No. A-3177-06 (Dec. 17, 2007).

gainful employment and military service prior to his incarceration. Pandure's primary parole plan contemplated his moving to Florida to reside with and care for his ailing elderly mother and collecting veteran's benefits based on his prior honorable service. The doctor noted Pandure described having support from his family and "prosocial friends."

Dr. Perry-Goffney also reported Pandure "adjusted well to incarceration" and had no history of psychiatric or mental health concerns, presenting as "stable with no evidence of a major mood, anxiety, or thought disorder." He displayed no signs of "suicidal or homicidal ideation." The doctor thus concluded "there are no acute psychiatric symptoms to be considered" should Pandure be released.

The "needs assessment" reflected Pandure "scored a [fourteen] on the LSI-R," evaluating future risk of reoffending. Based on a sample of inmates studied in New Jersey, Pandure scored "low risk" for "recidivism with a 20% chance of re-arrest and a 13.3% chance of reconviction within two years of release." Further, the doctor concluded Pandure had a "good" likelihood of completing a projected term of parole. Dr. Perry-Goffney noted Pandure's lack of prior substance abuse, lack of criminal history, work history, and education.

Noting Pandure's defensiveness, the doctor explained Pandure presented as "likely to downplay behavior that may evoke ridicule or contempt" and

therefore "may fail to take risks for fear of making mistakes or appearing unconventional, which can cause him to confine his behavior and feelings to those that are safe and socially acceptable." Thus, "[w]henever possible he will maintain a consistent and socially acceptable behavioral pattern and will restrain signs of personal autonomy or independent thinking." The doctor further noted, "[c]onformity to the rules and values of those in power is emphasized in daily life."

The assessment included Pandure's account of the offense, in which Pandure acknowledged he and Joel discussed killing Wanda for the life insurance, but claimed he never expected his brother to follow through. Pandure's admission went only so far as to say he was responsible for Wanda's death because he should have taken action to prevent Joel from carrying out the murder. Accordingly, Dr. Perry-Goffney stated, "Pandure, even in admitting guilt, does not fully accept culpability" when compared to the investigative reports concerning the offense.

Although characterizing Pandure's crime as "driven by greed," "abhorrent and ruthless," Dr. Perry-Goffney nonetheless opined Pandure presented a "low probability of reoffending," noting financial benefit might impact that prediction in light of the circumstances of his past crime. Assessing Pandure's strengths,

9

the doctor also opined Pandure reached an age "usually commensurate with decreased impulsivity, reactivity and likely less criminality."  If paroled, the doctor recommended, "if return to his family cannot be confirmed," then "placement in a halfway back program appears warranted."  The doctor further concluded Pandure had a "good" likelihood of completing a projected term of parole due to "constellations of risks and strengths previously identified."

Pandure also submitted information in furtherance of his parole application, including a handwritten letter of apology to "the victim," expressing remorse for his "inexcusable" conduct, revealing he "prays for," but does not "expect," forgiveness.  He acknowledged he "can't imagine the pain" he caused to the victim and her family, and he expressed his wish he could "undo what [he did]," knowing such wishing "will remain fruitless."  He explained "these justly imposed decades in prison have brought [him] to his knees."  He further added he had been in denial over what he had done, but his heart was "full of remorse" and "penitent."

In a separate written statement, he expressed to the Board:

> My telling you how sorry I am for my part in conspiring to kill my wife Wanda, with my brother, . . . is likely not of real value to parole.  Still I do so just the same. I am truly remorseful, and I accept full responsibility for my actions and inactions.

10

Pandure also submitted a type-written account of the offense, in which he again confined his role to the initial conversation with Joel about killing Wanda.

Pandure further included numerous letters from supportive friends and family advocating for his release. He included medical records memorializing his significant health issues.

A hearing officer referred the matter to a full Board panel for a hearing which took place on May 30, 2024. Pandure was the sole witness, and the panel focused its inquiry on the nature of the offense and Pandure's insight into his role in it.

When asked about his role in the murder, Pandure explained his belief that Joel killed Wanda based on their conversation regarding Pandure's suspicions that Wanda had cheated. During that conversation, Pandure claimed Joel asked, "[Y]ou want me to take care of that[?]," after which Pandure "just walked out." Pandure indicated, after Wanda's death, Joel confirmed, "I told [you] I took care of that." Pandure explained he believed he was "really responsible for [Wanda's murder]" because he "failed to act" when Joel threatened to "take care of that," and he "should have . . . made sure it was clear to that what he was . . . thinking was crazy." Pandure added that he did not believe Joel was serious.

11

The panel then focused its questioning upon the offense details, including Wanda's life insurance policies and proceeds. Pandure responded indicating a prior robbery at the Dunkin' Donuts where the two worked prompted Wanda to fear for her safety and seek life insurance. He acknowledged being the primary beneficiary and receiving proceeds after her death. He denied paying Joel to commit the murder and claimed he "lent" Joel money after receiving the life insurance benefits. Despite continued questioning, Pandure maintained there was no payment in exchange for Wanda's murder.

When asked about whether he would reoffend, Pandure urged he would not and explained he was "calmer now" than he was at twenty-six. A panel member responded stating that Pandure was not the one who "physically kill[ed]" his wife; rather, he was involved in the planning of it. To this, Pandure reiterated his complicity concerned his "failure to act." When the Board asked again, Pandure explained he had "zero inclination[]" to reoffend.

When questioned about his prior institutional infractions, Pandure explained they were the product of "bad decisions," and the drill bit was contained within a radio and never intended as a weapon. He explained he never possessed a weapon or committed any violent act while imprisoned.

A-1357-24

Pandure also indicated his plan upon release was to care for his ninety-two-year-old mother in Florida. The panel expressed concern with this plan given Pandure's age and medical condition, but Pandure acknowledged that although his asthma prevented his maintaining a full-time job, he was able and prepared to assist in the care for his elderly mother. When asked about potential future involvement with his former co-conspirators, and upon one panel member's suggestion Pandure had involved his mother in the murder plot by enlisting his mother to pick up Wanda, Pandure stated he always had a good relationship with his mother and denied that she had any involvement in Wanda's murder. Pandure further explained Joel was currently paying for their mother's nursing care. Pandure stated he has not spoken to Joel about Wanda's murder, but agreed his relationship with Joel was "in good standing."

Pandure was also questioned about his alleged plot to hire his cellmate to kill witnesses scheduled to testify against him at trial. He denied soliciting his cellmate to kill witnesses, explaining the "money orders," which were alleged to be the payment for the killings, were payment for something that turned out to be a scam upon him.

As the hearing progressed, the inquiries mounted regarding Pandure's role in the offense, seeking admissions as to details of the offense. Seemingly

13

frustrated by Pandure's responses, one panel member stated, "I feel like you've been lying to me for like two hours and it's kind of upsetting." The same member continued, "This is a hearing about your parole release . . . [a]nd you find it appropriate all throughout the hearing to laugh at different questions." Pandure questioned the Board member's allegation that he was laughing during the hearing and the same member responded that he was reading from "the court's findings," and asserted, "all you want to do is argue the facts. Because I feel like you believe you're wrongfully incarcerated and you've said that as much today." He added, "today you talked about the only thing that you're guilty of is inaction. And to me, that shows fatal flaws in your thinking if you think the only thing you're guilty of is not doing anything."

This member also took issue with Pandure's denying he paid Joel to kill Wanda. Noting our decision reflecting Pandure provided Joel money and title to the car after Wanda's murder, the panel member stated, "you think the only thing you did was loan your brother money, that's not true. . . . So how can I say that you've changed your criminal mind[set] when you won't even acknowledge it all this time later?" Pandure insisted he accepted responsibility and claimed he confessed to a priest and admitted his guilt. He also explained attending Focus on the Victim in 2019 led him to realize, "I think I am really

14

responsible for this," and "to understand that [his] brother must have done this." To this, the member stated Pandure should have instead learned the steps he took "to conspire with [his] brother and [his] mom to do all these things that led to his wife's murder for financial gain." He concluded, "You blame everything on your brother. And you act like you loaned him money . . . because he was [in] debt."

As the hearing concluded, Pandure addressed the panel, denying any allegation that he lied to them, citing the contradictory evidence at trial, the jury's verdict acquitting him of the attempting to have witnesses killed and the weapons offenses, and the jury's failing to conclude he procured his wife's killing by promising payment. Pandure clarified, "I truly believe this is all my fault" and "it wouldn't have happened if I had done something to stop it."

After deliberating, the full Board panel denied Pandure parole and imposed an FET of thirty-six months. The panel's written Notice of Decision reflected the panel found the following mitigating factors: (1) "minimal offense record"; (2) "participation in programs specific to behavior"; (3) "participation in institutional programs"; (4) institutional reports reflect favorable institutional adjustment; (5) "attempt made to enroll and participate in programs but was not

15

admitted"; (6) "minimum custody status achieved"; (7) "risk assessment evaluation"; and (8) "commutation time restored."

The notice indicated the panel's reasons for denial were (1) "facts and circumstances of the offense," (2) serious institutional infraction history, and (3) "insufficient problem resolution," noting Pandure "minimize[d his] conduct." The panel handwrote the following under "other":

> INMATE INDICATED TO THE BOARD THAT HE TAKES RESPONSIBILITY FOR THE DEATH OF HIS WIFE. HOWEVER, INMATE'S COMMENTS AND ANSWERS TO BOARD'S QUESTIONS DEMONSTRATED A PATTERN . . . TO MANIPULATE THE FACTS . . . AND SIDESTEP TAKING RESPONSIBILITY FOR HIS ACTIONS AND INMATE PORTRAYS HIMSELF AS THE VICTIM . . . SHOWING NO EMPATHY OR REMORSE FOR HIS WIFE. INMATE CANNOT ARTICULATE WHAT IT IS HE ACTUALLY DID OR WAS RESPONSIBLE FOR IN HIS WIFE'S DEATH.

Pandure administratively appealed the full Board's decision, which was denied by written decision dated October 30, 2024. Pandure argued the full Board: never made a finding, under the pre-1997 standard governing his parole considerations, that a preponderance of the evidence demonstrated a substantial likelihood that Pandure would commit another crime if released on parole; failed to consider material facts favoring release, including his age, personal history, and sustained institutional record of good behavior; relied too heavily on remote

infractions; exhibited bias against him; and reached a conclusion contrary to its own written policies and procedures, particularly by anchoring its conclusions in improper considerations such as conduct for which the jury expressly acquitted him.

The Board addressed and rejected Pandure's claims, beginning with his contention the Board failed to consider material facts, including his participation in institutional programs and his prior history including military service. The Board explained that Pandure's "program participation, institutional adjustment and educational achievements are a matter of record, . . . and were considered by the Board" and found the denial was properly based on a review of Pandure's entire record in accordance with N.J.A.C. 10A:71-3.11.

Although the panel failed to note Pandure's age, the Board noted his age "is a matter of record" and nonetheless "not dispositive" of "suitab[ility] for parole release." The Board found the panel's parole denial was based on Pandure's failing to reach "a level of maturity," based on his "manipulat[ion]" of facts and failure to "take responsibility" for his actions, portraying himself as the victim, and failing to disclose the extent of his role in the crime.

The Board rejected Pandure's claim that the preponderance of the evidence does not show a substantial likelihood he would commit a crime if released and

that the panel never made the appropriate finding. The Board also found, pursuant to N.J.A.C. 10A:71-3.11(b)(2), (4), and (7), the panel had authority to consider Pandure's "commission of serious disciplinary infractions, [his] adjustment to incarceration and [his] pattern of less serious disciplinary infractions, respectively, to determine [his] suitability for parole." The Board explained that, although Pandure had been "infraction free" for eighteen years, his institutional violations were serious in nature.

The Board further agreed with the full panel, finding Pandure's statements "exhibit[ed] insufficient problem resolution" and conduct minimization. It noted Pandure "made some progress," but remained unable and unwilling to articulate his responsibility for the murder. The Board's decision suggested "admission of guilt may help you to develop insight into the causes of your criminal behavior." Thus, the Board determined the panel correctly found Pandure substantially likely to commit another crime if released.

As to Pandure's claim the full panel decision was contrary to written policy or procedure due to questioning about charges for which he was acquitted, the Board indicated that Pandure was found guilty of conspiracy to murder Wanda, but the jury could not "arrive at a unanimous verdict as to whether [he] had paid money or promised to pay money to have [his] wife murdered." The

A-1357-24

Board found the panel did not consider Pandure's dismissed charges as an aggravating factor, rather, it focused on Pandure's denying he conspired to murder his wife, which was "a direct reflection of [Pandure's] criminal mindset."

The Board finally rejected Pandure's argument that a Board member exhibited bias, became upset, called Pandure a liar, and "mocked" his going to confession at a Catholic church. The Board found the panel's questions appropriate in considering the nature of the offense and aggravating and mitigating circumstances, pursuant to N.J.A.C. 10A:71-3.11(b)(5)-(6), and noted the panel gave Pandure ample time to answer questions. The Board found the panel member's accusation that Pandure was lying properly based on the incongruity between Pandure's statements and the record. Regarding the reaction to Pandure's attending confession, the Board explained nothing in Pandure's record reflected attendance at church services. Thus, the Board affirmed the panel's denial and FET.

## II.

On appeal, Pandure argues the Board erred in finding a preponderance of evidence demonstrated a substantial likelihood of his reoffending if released, as required by the Parole Act of 1979. He asserts the Board failed to consider relevant factors, such as his age, personal, and institutional history which

19

support parole release, and instead, "consistently attempted" to "discredit" Pandure's achievements while incarcerated.  He further contends the Board misapplied the controlling standard and engaged in "ad hoc rulemaking" by considering factors such as "failure to cooperate" and "lack of insight," and improper considerations such as dismissed charges.

## A.

"The scope of our review is narrow."  Berta v. N.J. State Parole Bd., 473 N.J. Super. 284, 302 (App. Div. 2022).  The Board's parole determinations are entitled to deferential review given its expertise in rendering "'highly individualized' appraisal[s]" of an inmate's future behavior.  Acoli v. N.J. State Parole Bd., 250 N.J. 431, 454 (2022) (quoting Trantino v. N.J. State Parole Bd. (Trantino VI), 166 N.J. 113, 173 (2001)) (excess internal quotation marks omitted).  As with any agency, we will not disturb the Board's decision unless it was "arbitrary, capricious or unreasonable" or "unsupported 'by substantial credible evidence in the record as a whole.'"  Berta, 473 N.J. Super. at 302 (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)).

> In determining whether an agency action is arbitrary, capricious, or unreasonable, we examine:
>
> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record

contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Ibid. (citations omitted) (quoting In re Carter, 191 N.J. 474, 482 (2007)).]

We review questions of law de novo. See Perry v. N.J. State Parole Bd., 459 N.J. Super. 186, 193-94 (App. Div. 2019).

Parole determinations "are entitled to deferential review by our courts," and "[a] mere difference of opinion is not a basis for a court to overturn a parole decision." Acoli, 250 N.J. at 454. Nevertheless, "when a parole decision is so far wide of the mark or so manifestly mistaken under the governing statutory standard, intervention is required in the interests of justice." Id. at 455.

As here, "[p]arole for a conviction imposed on offenses committed before August 18, 1997, 'is governed by the standard[s] in N.J.S.A. 30:4-123.53(a) and 30:4-123.56(c) prior to the amendment of those statutes on that date.'" Perry, 459 N.J. Super. at 194 (second alteration in original) (quoting Williams v. N.J. State Parole Bd., 336 N.J. Super. 1, 7 (App. Div. 2000)). Because Pandure's crime occurred in 1991, "the Parole Board may deny parole release if it appears from a preponderance of the evidence that 'there is a substantial likelihood that

the inmate will commit a crime under the laws of this State if released on parole at such time.'" See ibid. (quoting Williams, 336 N.J. Super. at 7) (internal quotation marks omitted).

"'Likelihood' is defined as a 'probability,' or 'the appearance of probable success,' and 'substantial' is defined as 'considerable in amount' or 'being that specified to a large degree.'" Acoli, 250 N.J. at 455-56 (quoting Webster's Third International Dictionary 1310, 2280 (1981)). Further, "Assessing the risk that a parole-eligible candidate will reoffend requires a finding that is more than a mere probability and considerably less than a certainty. To be sure, the mere 'potential' that an inmate if released may reoffend is not sufficient." Id. at 456.

In determining whether an offender presents a substantial likelihood of committing a crime if released, the Board "must assess a number of factors for the purpose of determining 'what a man is and what he may become rather than simply what he has done.'" Ibid. (quoting Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 10 (1979)). Further, N.J.A.C. 10A:71-3.11(a) provides "the grant or denial of parole must 'be based on the aggregate of all pertinent factors.'" Id. at 457 (quoting N.J.A.C. 10A:71-3.11(a)). N.J.A.C.

22

10A:71-3.11(b) sets forth a list of twenty-four factors that the Board should consider in making a parole decision.[5]

"Under the governing statutory and regulatory framework, once a defendant becomes eligible for parole, he or she is entitled to 'a presumption in

___

[5] The N.J.A.C. 10A:71-3.11(b) factors are: (1) commission of an offense while incarcerated; (2) commission of serious disciplinary infractions; (3) nature and pattern of previous convictions; (4) adjustment to previous probation, parole and incarceration; (5) facts and circumstances of the offense; (6) aggravating and mitigating factors surrounding the offense; (7) pattern of less serious disciplinary infractions; (8) participation in institutional programs which could have led to the improvement of problems diagnosed at admission or during incarceration; (9) statements by institutional staff, with supporting documentation, that the inmate is likely to commit a crime if released, that the inmate has failed to cooperate in his or her own rehabilitation; or that there is a reasonable expectation that the inmate will violate conditions of parole; (10) documented pattern or relationships with institutional staff or inmates; (11) documented changes in attitude toward self or others; (12) documentation reflecting personal goals, personal strengths or motivation for law-abiding behavior; (13) mental and emotional health; (14) parole plans and the investigation thereof; (15) status of family or marital relationships at the time of eligibility; (16) availability of community resources or support services for inmates who have a demonstrated need for same; (17) statements by the inmate reflecting on the likelihood that he or she will commit another crime; the failure to cooperate in his or her own rehabilitation; or the reasonable expectation that he or she will violate conditions of parole; (18) history of employment, education and military service; (19) family and marital history; (20) statement by the court reflecting the reasons for the sentence imposed; (21) statements or evidence presented by the appropriate prosecutor's office, the Office of the Attorney General, or any other criminal justice agency; (22) statement or testimony of any victim or the nearest relative(s) of a murder/manslaughter victim; (23) the results of the objective risk assessment instrument; and (24) subsequent growth and increased maturity of the inmate during incarceration.

23

favor of parole.'" Berta, 473 N.J. Super. at 304 (quoting In re Parole Application of Trantino (Trantino II), 89 N.J. 347, 356 (1982)). Thus, "the burden is on 'the State to prove that the prisoner is a recidivist and should not be released.'" Id. at 304-05 (quoting Trantino VI, 166 N.J. at 197). "Overcoming the presumption of parole is a 'highly predictive' determination which must take into account 'the aggregate of all of the factors which may have any pertinence.'" Id. at 305-06 (citation omitted) (first quoting Thompson v. N.J. State Parole Bd., 210 N.J. Super. 107, 115 (App. Div. 1986); then quoting Beckworth v. N.J. State Parole Bd., 62 N.J. 348, 360 (1973)).

Critically, "the parole release decision is fundamentally different from the decision made by a trial court when imposing the initial sentence." Id. at 305. Although the circumstances of the underlying offense are relevant under N.J.A.C. 10A:71-3.11(b)(5), "'the gravity of the crime' cannot serve as 'an independent reason for continuing punishment and denying parole' under the 1979 Act." Ibid. (quoting Trantino II, 89 N.J. at 373-74). "That is because the punitive aspects of the sentence have been satisfied by the time an inmate is eligible for parole." Acoli, 250 N.J. at 457.

A-1357-24

B.

Against this backdrop we consider Pandure's arguments, preliminarily finding no merit in his claim the Board failed to apply the proper standard for crimes committed prior to 1997, requiring parole denial to rest on a preponderance of substantial credible evidence in the record demonstrating a substantial likelihood he would reoffend. We are satisfied, from our review of both the full panel denial and the Final Agency Decision, the Board utilized the correct controlling standard applicable to Pandure's application.

However, we are not convinced the Board meaningfully considered all relevant factors and information, as is required to fairly assess Pandure's suitability for parole. Thus, we are unable to conclude the Board's decision denying parole was a proper exercise of its discretion.

Like the Board, we recognize the heinous and calculating nature of the offense. Pandure's conspiring with his brother and brother-in-law to murder his young wife was undisputedly reprehensible and vile. It is also clear Pandure sanitizes his role in the offense by instead emphasizing his brother's conduct in shooting Wanda. He frames his role as almost passive in failing to stop his brother from carrying out the crime after their first discussion. However, we note the record and Pandure's written parole submission and statements at the

A-1357-24

hearing were replete with his unequivocal expressions of remorse, regret, and of "full responsibility" for bringing about Wanda's death. Neither the hearing panel, nor the Board in affirming the panel's decision, recognized Pandure's statements accepting responsibility. No attempt was made to reconcile Pandure's acknowledgment of the pain he caused the victim and her family with the Board's finding he took "no responsibility for [his] actions that led to the murder of his wife."

Further the hearing record reveals Pandure was heavily probed about certain unproven events and allegations, such as his involving his mother in the plan to kill Wanda, paying a cellmate to kill witnesses, and procuring Joel's assistance in killing Wanda by monetary payment. When Pandure denied those allegations, he was accused of lying. The panel and the Board then placed weighty emphasis on their conclusion Pandure lied and minimized his conduct and held no empathy for Wanda or remorse for his actions.

As we cautioned in Berta,

> an admission of guilt is not a prerequisite to parole, and thus ongoing refusal to admit guilt cannot be treated as a categorical bar to parole. Acoli, 250 N.J. at 452. Confession may well be good for the soul, but it is not a precondition to release from prison. See N.J.A.C. 10A:71-2.11. Nor is the refusal to admit guilt a talisman before which the statutory presumption of parole evaporates.

26

[473 N.J. Super. at 318.]

We further held "an inmate's contention that he or she is innocent of the crime(s) for which he or she has been imprisoned may be considered, but only insofar as it pertains to the foundational question of whether there is a substantial likelihood that he or she will reoffend." Ibid.

Here, the Board failed to "explain[] why its subjective assessment supports the ultimate conclusion that there is a substantial likelihood [Pandure] will reoffend." See id. at 319. It omitted its basis for drawing what appears to be a direct nexus between Pandure's admissions, or lack thereof, and the probability of his recidivism. This is the precise speculation upon which parole determinations may not be grounded.

The Board's determination is likewise threadbare of any meaningful references to relevant evidence in the record mitigating in Pandure's favor. Notably, pertinent evidence such as Pandure's advancing age, two decades of good behavior, engagement in courses and programs, statements of remorse, viable parole plan and resources, and recent in-depth mental health evaluation finding a "low risk" of reoffending, were either not addressed, barely mentioned, or viewed with a jaundiced eye.

27

The panel questioned the legitimacy of Pandure's MBA certification, religious practices, and ability to care for his mother in light of his health issues, despite his referencing his veteran's benefits and physical ability to meet her needs. The panel made no reference to his age or law abiding conduct.

We do not dispute the Board's statement in affirming the panel's denial, noting that age is not singularly dispositive of an offender's probability of reoffending. However, the absence of any meaningful consideration of Pandure's age and poor health renders us unpersuaded the hearing panel or the Board fairly considered Pandure's age. Similarly concerning is the Board's failure to reconcile Pandure's two decades of offense-free incarceration with a finding he is substantially likely to reoffend. As to the remote infractions, we recognize the Board's expertise and its fairly noting they are categorized as serious offenses. However, we question the negative weight afforded to those prior infractions, particularly given his favorable conduct over the last twenty years.

Perhaps most significantly, we are unconvinced the Board truly considered the detailed and comprehensive mental health assessment placing Pandure at "low risk" to reoffend, or Dr. Perry-Goffney's conclusion Pandure did not pose a substantial risk of reoffending if released. Indeed, the doctor's

28

conclusions squarely undermined the Board's finding Pandure substantially likely to reoffend. Neither the hearing panel nor the Board recognized Dr. Perry-Goffney's low risk assessment or that it was made even recognizing Pandure had not fully admitted his role in the offense. Failure to reconcile the conflicting in-depth mental health evaluation and risk assessment with its comparatively unscientific predictions renders the Board's conclusions arbitrary, capricious, and unreasonable.

We are thus constrained to vacate the parole denial and remand for a new hearing at which the Board will consider the entirety of Pandure's record, adequately address all relevant factors, and explain its determination regarding whether Pandure is substantially likely to reoffend. We do not suggest the outcome of that hearing. We note only that the lens through which Pandure's parole application is to be considered is presumptive release, see Berta, 473 N.J. Super. at 304 (quoting Trantino II, 89 N.J. at 356); thus, it is incumbent on the Board to satisfactorily consider all applicable factors and explain its findings, rooted in the record as a whole.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

29

A-1357-24